Curtis **HOLT**, Sr., etc., et al.

v.

**CITY OF RICHMOND**, etc., et al.

Civ. A. No. 151–71–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 20, 1971.

W. H. C. Venable, E. G. Allen, Jr., Richmond, Va., for plaintiffs.

Matthew N. Ott, Jr., Conard Mattox, Jr., Daniel Balfour, Horace H. Edwards, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This class action brought by plaintiff, Curtis Holt, Sr., a member of the Negro race, a resident of that portion of the pre-annexed area of the city, in his own behalf and in behalf of all others similarly situate, seeks an adjudication of the rights of the plaintiff and members of his class arising from alleged actions of the individually named defendants who are, with one exception, elected officials of the City of Richmond, the municipal corporate defendant.

The Court has heard five days of testimony, much of which has been of conflicting nature, and has examined the exhibits introduced, and concludes as follows:

Jurisdiction of the Court is attained pursuant to Title 28 U.S.C.A. § 1343(3), (4), 1344, 2201, 2202; Title 42 U.S.C.A. § 1971 et seq.

This action is a prolongation of what appears to be the sad saga of the City of Richmond, the capital of Virginia, to cope with problems arising from its alleged lack of certain material and human needs of a viable city. In order to put the Court's factual conclusions in appropriate perspective it is necessary to recite in some detail the background of events leading up to and including a decree of the Chesterfield Circuit Court entered on July 12, 1969, the consequences of which allegedly violated constitutionally protected rights of the class of which the plaintiff is part.

Richmond is a distinct and separate political entity as are each city and county in Virginia. Virginia law provides for the merging of two political entities under certain conditions, and permits likewise, under certain conditions and circumstances, the taking by a city of a county, or a portion thereof, by appropriate annexation proceedings—which are heard by a specially constituted annexation court consisting of three Circuit Judges of the Commonwealth.

The evidence discloses that in 1961 an unsuccessful attempt was made to merge the city and the County of Henrico. Immediately subsequent to the unsuccessful merger efforts, the city on January 2, 1962, filed annexation suits against the County of Henrico and the County of Chesterfield—both contiguous counties to the city. The city sought the acquisition of approximately 152 square miles of Henrico and 51 square miles of Chesterfield.

It is perhaps an understatement to describe the respective law suits as bitterly and vigorously contested.

The Court is satisfied from the evidence that the initial proceedings against each county were not motivated by any effort to dilute, deny or disenfranchise the vote of Negro citizens. In short, at the time of the institution of the respective actions, while the Negro population of the city was increasing and the white decreasing, the vote of the city's Negro citizens was not so material a factor as to give rise to serious political considerations—the Negro citizen was then, as was historically true, hampered by restrictive laws and conditions, some of which were obvious and others of more subtle nature, but nevertheless effective impediments to fully exercising and utilizing rights accorded all citizens under the Constitution of the United States.

The city's suit against Henrico was finally culminated some three years later (March 1965) by rejection by the city (a right accorded it under Virginia law) of the court's award to it of approximately 16.16 square miles of Henrico County, populated by approximately 45,000 people, the overwhelming majority of whom were white, conditioned on the city's expending sums of approximately 55 million dollars.

Within months thereafter the city attempted to vitalize its still pending but dormant annexation suit versus Chesterfield County. Circumstances, the details of which are not necessary for the purposes of these findings to elaborate upon, finally led to a trial of the action commencing in the Spring of 1969. The period ensuing from the date of the filing of the original annexation suits against the counties had brought vast changes in the voting strength of the Negro community—the poll tax had been removed as a requisite to voting and much encouragement had been accorded the Negroes to exercise their right of franchise—the evidence shows an increase in Negro voting strength ranging from 4,000 qualified voters in 1956 to more than 35,000 at the present time.

The early and middle 1960's brought with them two emerging political forces in the city—one of which was known as Richmond Forward, a successor to Richmond Citizens' Association, a predominantly white organization, an effective group of civic minded citizens who solicited, encouraged and assisted candidates for the City Council which was and is composed of nine members elected at large; the other force was a group of civic minded Negro citizens, known as the Crusade for Voters, who encouraged and assisted qualification of Negro voters and who, while not soliciting citizens to

run for Council, did and do endorse certain announced candidates.

The strength of the latter organization is perhaps best illustrated by the fact that in 1968 two Negro members of Council failed to receive the Crusade's endorsement and were defeated. The record abounds with evidence pointing to a dramatic awareness, certainly by 1968, by any reasonably knowledgeable person, of the increasing political effectiveness of the Crusade.

While in 1968 there were more whites than Negroes registered to vote, about 50% of the registered Negroes voted as against approximately 30% of the white registered voters.

It is obvious that the annexation of a part of Chesterfield County, which came to pass effective January 1, 1970, and which brought to the city approximately 47,000 additional people 97% of whom were white, resulted in a dilution of the Negro vote just as a dilution of the Negro vote would have resulted had the city accepted the Henrico Annexation Court's decree. Perhaps the simple and inevitable consequence of such a dilution as occurred, in light of a failure on the part of the city to conform to the requirements of Title 42 § 1973c—which requires certain action on the part of a political subdivision before voting procedure changes are effective—effectively concludes this law suit. Annexation has been held by the United States Supreme Court to come within the Congressional mandate.[1]

If, however, that issue were all there is to the case, then motivation would be of no consequence.

In light of the Court's admitted doubt that good fortune would indeed permit the Court to fulfill its obligation by so simple an answer as a pronouncement either that failure on the part of the defendant municipality to follow the mandate of § 1971c ends the case, or, in the alternative, that the inevitable and consequential dilution of the voting strength of the plaintiff class ends the litigation,

it follows that the parties are entitled to a full exploration by the Court of all reasonably contemplated essential facts.

Motive and actions of legislatures smacking of racial considerations triggers a judicial demand that same be examined.

Obviously all racial considerations are not automatically forbidden. Indeed there may be many situations in which race may well and appropriately be taken into consideration. However, when it appears that race has been taken into consideration in connection with so basic and fundamental a constitutional grant as voting, coupled with Congress' concern as apparent from the enactments of the Voting and Civil Rights Acts, then it is required that an examination be made as to the use of any forbidden purpose.

Here plaintiffs complain that the defendants have disadvantaged the members of one racial group—just at the moment in which the plaintiff class emerged as a strong and viable influence in reference to the legislative body of the city their strength was dissipated. Examination is mandated.

During the trial, unfortunately, much conflicting testimony emerged. Nevertheless, there are many facts and conclusions from same which may reasonably be drawn which appear to the Court to be beyond a mere preponderance.

In the context of the instant consideration, the gist of plaintiffs' complaint is a so-called compromise agreement of which the principal architects were the legislative heads of the city and Chesterfield County.

The facts are reasonably ascertainable —the city, for reasons its legislative body without any specific intent to dilute the voting strength of what was at that period of time (1961) a not immediately foreseeable force, felt the need for expansion. An attempted merger had failed; litigation against Henrico County had not borne fruition. If the legisla-

---

1. Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (January 14, 1971).

tive intent at that period of time encompassed as its sole objective the dilution of the Negro vote, the acceptance of the Henrico Annexation Court award would have and could have been accomplished. Only one Negro had up to that time been elected to the City Council, and that in 1948. The Negro voters were generally opposed to any merger or annexation, obviously recognizing the consequential dilution of their anticipated emerging solidarity of voting strength. Nevertheless, at the time of the city's rejection of the Court's territorial awards there was still pending the Chesterfield suit seeking annexation of 51 square miles containing an even larger percentage of whites than would have been contained in the Henrico award.

During the pendency of the lawsuits versus Henrico and Chesterfield, efforts were made to effectuate a compromise agreement. Immediately following the rejection of the Henrico award, city representatives met with Chesterfield County representatives for purposes of discussing an amicable adjustment of the suit. Discussions between the City Manager and the County Executive Secretary, both of whom were the employees of the respective political subdivisions and accountable to their respective legislative bodies, met from time to time, but without fruition.

While the suit traveled a rough and litigious trail, City Council's make-up took some changes, and by 1968 there were three members who were not in sympathy with the views of the other six majority members in reference to boundary expansion. The views of the three minority members, one of whom was Negro, were generally considered by the majority to be representative of the views of the Negro community, at least on this issue, each of them having received the Crusade's endorsement, and heavy support from Negro voters.

In the meetings between city and county representatives which were held over the years between 1965 and the culmination of the Chesterfield suit, the racial makeup of the population which the city was to receive was discussed.

It would be unfair to characterize all such references to race as pertaining directly to the Negroes' growing voting strength, although unquestionably some of the discussions centered on that subject. One fact, regardless of any other, is patently obvious The city initially wished as much territory and population as it could secure, and the county wished to save as much and as many as it could.

The evidence before the Court shows a concern not only of the officials of the city and county, but of State officials as well, that the City of Richmond not become a city of the old, the poor and the Black. Once again the Court points out that the concern of not all who so expressed themselves was primarily racially motivated.[2]

By 1968 the Legislature, primarily at the behest of the city, created a commission to study and recommend ways of alleviating, if they deemed it appropriate, the city's pronounced need for expansion. This commission met with representatives of the city and counties of Henrico and Chesterfield in an effort to effectuate a disposition of the city's apparently acknowledged difficulties. The Court finds that city officials expressed to at least two of the members of the State appointed commission a concern not only of the need for additional tax revenue, and other economic issues, but a concern as well that with the ever increasing Negro population of the city that one of the issues was who would govern the city. The evidence is uncontradicted that one of the city officials designated to encourage State action to expand the city's boundaries asserted as one need for prompt action on the part of the State Legisla-

2. However, suffice it to say for the purposes of these general findings, the Court does find that much of the expressed general concern as well as other more specific statements of at least certain city officials was inspired by a fear of a shift of control of the city's legislative body to members of the Negro race or those supported by the Negro voters.

ture that the 1970 Councilmanic Elections were approaching, and expressed a fear of the Negroes prevailing.

During the contested Chesterfield annexation suit, the legislative heads of the respective parties began a series of meetings, in which only the two were present, in an effort to reach a compromise agreement to be presented to the Court for its approval. One fact that is uncontroverted is that both parties to these meetings anticipated that the city would at least to some extent ultimately prevail in the then pending action.[3]

One should bear in mind the background of these meetings. The city had for almost ten years been attempting boundary expansion. Representatives of the two counties and the city, encouraged by interested citizens, had met and discussed the situation attempting to alleviate what apparently was generally accepted to be a problem of the city. Understandably the county representatives did not wish to accede to the city's demands as expressed in the prayer of the several lawsuits.

The city had been unsuccessful in merger efforts. They had, at least in the mind of a majority of the City Council, lost the Henrico annexation suit. The Chesterfield suit, pending since 1961 although dormant until 1965, was still unconcluded. There were members of City Council who were not in accord with the majority of City Council's views in reference to boundary expansion. The majority felt it necessary to exclude at least three members of Council from participating in certain discussions concerning this particular phase of the city's business. In short, the city's efforts to expand until 1969 seem to have been frustrated at every turn. One must also bear in mind that by 1969 the Negro vote in the city was beyond question a powerful

influence The legislative body of the city, while bound generally by a majority vote of its members, required in some instances a two-third vote for passage of certain matters.

By the time the legislative heads of the respective parties began serious meetings leading to the compromise, which was ultimately reached, the city had in the same suit already been to the Virginia Supreme Court and in addition the suit had once resulted in a mistrial. Surely the frustrations contained in the history of the matter were not entirely lost upon those immediately concerned. Any delay which would result in a failure to implement any annexation decree by January 1, 1970, would result in at least another year's further frustration, since Virginia law makes all annexation decrees effective on January 1.[4] An appeal by Chesterfield of the anticipated decree would obviously have precluded any dilution of the Negro voting power long enough for it to vitally affect the Councilmanic Election of 1970.

The Court is cognizant that any compromise agreement in the then pending suit and/or judicial decree resulting in annexation would have diluted the Negro vote. The County of Chesterfield was at the time better than 91% White.

The Court views the important fact, if the issue is one beyond mere mathematical dilutions coupled with a failure to comply with the Voting Rights Act, in this case to center around the compromise.

The Court finds that at least one of the factors leading to the city's acquiescence to the compromise was a motivation to thwart any potential threat created by the rapidly growing voting strength of the Negro segment of the population, that would result in the election of a sufficient number of councilmen whose attitudes

3. The State Court expressed itself as follows, "It is copiously apparent that Richmond is entitled to some annexation in this case;" and at another point, "The evidence overwhelmingly convinces us of the necessity for and the expediency of some annexation;" and at another point,

"until the evidence of the so-called agreement was offered, the court was faced with the problem of determining the annexation line and fixing the amount of compensation."

4. Va.Code Section 15.1–1041.

would create further frustrations toward expansion of the city's boundaries, as the then majority deemed necessary. In addition, the Court cannot be oblivious to the evidence that what may be described as a polarization of the two major political factors in city elections was emerging. In 1968 the Crusade's endorsement of candidates had not overlapped with the endorsement of the predominantly White organization, Richmond Forward. To suggest that such political polarization of the racially different groups was not a factor considered by elected officials whose election could to a reasonable degree be attributed to the respective organizations, is to ignore the obvious. Indeed the evidence adduced points to a polarization within Council itself at the time.

To suggest that the desire for boundary expansion was solely for the purpose of thwarting the Negro voters would be to do a disservice not only to those to whom any such purpose might be attributed, but to the whole of the city's electorate.

There was on the part of the then majority of City Council, as well as on the part of other citizens, a conclusion that the city's boundaries had to be expanded for many reasons, some of which were entirely unrelated to either race or political control. It is likewise true that many of the reasons accorded to the need for boundary expansion were at least peripherally related to race. This, however, is a fact of life.

As is not unusual in any lawsuit, the parties to the annexation suit had been encouraged by the Court to explore the possibility of an amicable adjustment of the pending matter. Such exploration was made by the respective operating heads of the litigants without any appreciable results. Mayor Bagley and Mr. Horner, the then Chairman of Chesterfield Board of Supervisors, began serious discussions leading toward the ultimate compromise. These gentlemen met and conferred in an atmosphere of reasonable secrecy. It is interesting to note that no evidence has been tendered which would give rise to a conclusion that the city, during any discussions in regard to efforts to reach a compromise agreement, entered or participated in any such discussions from a position of legal impotence—indeed the evidence leads to a contrary conclusion.

Timing, however, was of the essence to the city by 1969, and the county's position is perhaps most appropriately described by the witness Horner's statement to the effect that his efforts were directed to "save what could be saved."

The Court finds that while the Mayor had some general knowledge of the areas and populations contained in that portion of Chesterfield County which was being discussed by him and Mr. Horner immediately prior to May 15th, the evidence shows that he did not have the detailed information required to effectively evaluate any tentatively agreed upon line except for the size of the area and the fact that there was a sufficient number of White population which could reasonably be expected to dilute the potential Negro vote so as to preclude legislative control by that segment of the population in 1970. As further support of the Court's finding that this concern led to the compromise, the Court finds that at least one witness, knowledgeable in the city's affairs and who was a member of Council at the time of the rejection of the Henrico Court award, had learned of the proposed Horner-Bagley compromise at a meeting held by the majority of the City Council. There he opposed the compromise on the grounds that it did not contain in his opinion enough land, and in addition it appeared to him that a more favorable court decision was imminent.

The city, during its litigation with Chesterfield, designated one person to be primarily responsible for the preparation of detailed materials for use in the pending law suit. The Court finds that he, Mr. Talcott, in spite of having all of the necessary detailed information available, did not learn of the tentatively agreed upon line until approximately eleven days after the fact when he was called upon for certain technical data

with reference to the financial aspects of the transaction. Obviously the timing of the compromise was tied to the immediate future political and racial control of the city's legislative body.

As part of the compromise agreement, it was understood that Chesterfield would not appeal the annexation decree embodying the compromise agreement, and efforts to discourage appeals by intervenors would be made by the Chesterfield Board.

■■■ The Court finds that the primary reason that the agreement between the Mayor and Mr. Horner, which was ratified by the majority of their respective colleagues, contained the foregoing understanding, was in order to assure an unquestioned White majority for the upcoming Councilmanic Elections. Hence that portion of the compromise agreement effectively precluding an appeal, permitted the annexation to become effective at a time so as to deliberately dilute the plaintiffs' class vote for the Councilmanic Election of 1970 and is the essence of the constitutional violations complained of. The purpose and effect was the thwarting of political control on the part of the Negroes for that election of 1970. Guarantees imbedded in the Constitution of the United States are not so pliable as to be bent under the guise of compromise litigation. Defendants argue that same was a proper exercise of legislative power. Indeed an analogous argument was made in Gomillion v. Lightfoot, 364 U.S. 339, at 345, 81 S.Ct. 125, at 129, 5 L.Ed.2d 110 (1960), where there was a re-allignment of political subdivisions resulting in an impairment of voting rights. The Court quoting from a prior case stated, "It is inconceivable that guarantees embedded in the Constitution of the United States may thus be manipulated out of existence." The majority of council under the guise of legislative power are not insulated from federal judicial review where the legislative power is used as an instrument for circumventing a federally protected right. See *Gomillion, supra.*

■■■ Annexation itself was inevitable as evidenced by the State court's decree. The fact that the proposed compromise terms were those adopted by the Circuit Court of Chesterfield County does not strike this Court as being unusual. All courts encourage compromises of litigation. Indeed there may well have been compromise agreement reached in any event, but the evidence before the Court gives every indication that one limited to the area annexed was unlikely considering the city's apparent legally meritorious position on the one hand, and the attitude of Chesterfield officials to fight and delay the inevitable as diligently and as long as they could on the other.[5] Only the presence of Negro voting power, which was on the verge of expressing itself sufficiently as to threaten the election of Whites in the upcoming Councilmanic Elections and which voting power the officials wished to impede solely because of race, prompted the city to agree to accept less territory and less tax producing properties than the city officials believed they would acquire by way of an uncompromised lawsuit. And so the Court finds. In short, compromise, and primarily that portion of it having to do with agreement not to appeal, was conceived and operated as a purposeful device to further racial discrimination by way of diluting the vote of the Negroes, and this is constitutionally impermissible. The Fifteenth Amendment forbids a deprivation of one's vote by reason of race— this Court interprets that to mean dilution as well. Indeed, *Gomillion, supra,* speaks not only of deprivation of one's vote but "of any impairment of voting rights." See also, Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965). An impairment of voting rights rooted in racial considerations cannot be sanctioned under the Constitution of the United States.

---

5. Apparently a compromise between two governing bodies in an annexation case was up to that time unprecedented. See

Vol. 26, p. 4794 of transcript of State proceedings.

The Court is cognizant that motivation and consideration of motivation have many pitfalls, as pointed out by the late Mr. Justice Black in Palmer v. Thompson, 403 U.S. 217, 91 S.Ct 1940, 29 L.Ed. 2d 438. All of the cases indicate that in those situations where motive was relevant to a decision of essentiality, the focus has been on the actual effects of that which was done.[5a] In spite of the obvious pitfalls in analyzing motivation, such a procedure has assumed an ever more important role in determining constitutional violations. Bad faith, or the lack of bad faith, is frequently under scrutiny where constitutional rights are involved. See Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

■ In the instant case we have a situation wherein the Court is conclusively satisfied that the purpose of the compromise agreement was to deprive the plaintiffs class of a basic constitutional guarantee. The requirement that each person's vote counts as much as every other person's insofar as it is practicable has even been applied to the election of trustees of a junior college. See Hadley v. Kansas City Junior College, District 97, 397 U.S. 50, 90 S.Ct. 791, 25 L. Ed.2d 45 (1970). As the late Mr. Justice Black has stated, "Federal courts have not hesitated to exercise their equity power in cases involving deprivation of property and liberty," and as he said, there is no reason why they should do so where the case involves the right to choose representatives which make laws affecting liberty and property.

The wrong to the plaintiff class was as to the Councilmanic Election of 1970. Ultimately there would have been a dilution of the class' voting strength. Annexation of any portion of Chesterfield would have accomplished this—but only because of the race of the members of the class was it accomplished prematurely.

While the Court has considered the evidence adduced concerning meetings between certain of the councilmen and candidates for council with certain of the community leaders of the annexed area subsequent to the court decree, the Court has frankly given little weight to what occurred therein simply on the grounds that it was not only after the fact, but unquestionably was in essence a political meeting. If any wrong had been done the plaintiff group, it had already occurred. The facts of political life are such that one would anticipate that any local political meeting might well evoke statements similar to those attributed to the respective candidates.

■ The Court has received evidence from both sides as to the effect of any decree by the Court which would effectively "de-annex" the territory acquired by the city by virtue of the State court decree. Only in the interest of a full record does the Court make its findings in this regard. The Court is impelled to express its doubt as to the propriety of entering any decree which purports to amend the geographical boundaries of the city as fixed by a duly constituted court of the Commonwealth of Virginia. That court, from the record in this case, was not faced with any issue of constitutional dimension concerning the impairment of the voting power or rights of the plaintiff class. Indeed the State court had the authority to consider any such issue if the plaintiff class had sought leave to intervene and present it. This Court has no judicial monopoly on considering constitutional issues; and the Court is satisfied that the State court would have considered any such issues raised. They were not so presented—perhaps because the knowledge of the events preceding the agreement not to appeal the agreed upon decree were unknown at the time. In any event, from

---

5a. See Wright v. Rockefeller, 376 U.S. 52, at 56, 84 S.Ct. 603, 11 L.Ed.2d 512; and see also comprehensive discussion by

Professor Ely, The Yale Law Journal, June 1970.

this Court's view of the matter, deannexation would be inappropriate and unnecessary.

It must be borne in mind that this is a law suit brought by and for the benefit of members of the Negro race "residing in—a portion of the city existent prior to annexation of a portion of Chesterfield County by Court decree of July 12, 1969." It is their justifiable complaint that their voting strength was diluted in the Councilmanic Election of 1970. True they seek in addition a declaration that the annexation award is null and void and without effect. The Court's findings, however, go primarily to that portion of the annexation proceedings which embodied in the compromise agreement a compact to dilute for the Councilmanic Election of 1970 the vote of the plaintiffs solely because of their race.

Geographical boundaries alone are of no particular consequence in formulating a remedy. The Court is not unaware of the reasonably apparent attitude of at least some of the witnesses called by the plaintiffs, and who reside in the annexed territory, toward a hoped for de-annexation decree.

Perhaps some solace may be gained by those so inclined from the Court's conclusions heretofore stated that de-annexation, even if appropriate, would be wasteful, and in the Court's further opinion, from the evidence adduced in reference to the meetings with the Aldhizer Commission, reasonably short-lived.

In short, de-annexation is not required or appropriate.

Plaintiffs argue that *Gomillion, supra,* requires de-annexation. That case involved approximately 400 Negro voters and was one in which the boundaries of the city of Tuskegee were re-defined, effectively removing from the city all save only four or five of its Negro voters. Except for the constitutional principles enunciated therein, the practical aspects dealing with remedy are far removed from the instant case.

Courts, and particularly federal courts, are all too frequently accused of exercising an excess of judicial muscle. The effort should appropriately be directed to maintaining, where possible and legally appropriate, the stability of the communities involved and affected by any court decree. This in no way implies a willingness to deny relief to a class or a member thereof whose constitutional rights have been violated. This Court is fully conscious that to some, constitutional rights are not only their most precious possession but perhaps their only hope to achieve the full benefits of citizenship. Just as a violation of any citizen's rights reflects in some degree on all citizens, so does the relief afforded for any such violation. Frequently the law demands what appears, at least to some, to be drastic relief. This, however, is not such a case as to require any interference with the affairs of Chesterfield County. It is a case in which the Court is in equity bound to make every reasonable effort to place the plaintiff class in a voting position for council members as merely equivalent as they were in July 1970.

■ Plaintiffs in their prayer, as one form of relief, ask that a new election for City Council be held, "excluding from the voter rolls any names from the * * * annexed area." This cannot be granted so long as those citizens are residents of the City of Richmond. Perhaps this very period of time—the post-annexed period—while the terms of the annexation decree are still being implemented, is the most necessary period for those citizens to have members of their own community sit on the City Council. That very need may well suggest a solution to the problem of relief.

The Court finds that de-annexation would, if legally required and appropriate, be possible, but impracticable.

The City of Richmond has appropriated millions of dollars for use in the annexed area. Millions have already been expended, and it is estimated that an additional five million dollars will be spent for capital improvements by the end of the fiscal year. Over five hundred persons have been employed specifically for

that area. Fire stations have been built, utility lines laid. The City Manager has described any de-annexation as being a job to "boggle the mind."

On the other side of the coin, the chief administrative officer of the county testified indicating that the county is willing, financially able and desirous of having the annexed territory and its populace returned. While the Court has little doubt that efforts on the part of both the city and county would be made to amicably adjust the financial aspects of any de-annexation, the Court is not oblivious to the fact that any such negotiations would, so far as the county is concerned, be a buyer's market and would result in a large financial loss to the city, consequently adversely affecting all taxpayers of the city including members of the plaintiff class. In addition, the county would be receiving 47,000 citizens whom they were agreeable to having annexed by the city in an effort to keep other territory from being annexed. Included therein are people who intervened in the annexation suit and who were the subject of that portion of the compromise having to do with efforts to discourage an appeal by the intervenors. Hardly a situation especially calculated to achieve community stability. County elections have recently been held, and these people have had no voice in the selection of the county officials by whom they would be governed. In addition, many thousands of people have been affected by the change of geographical limits. It is pure speculation to say that a restoration of the physical boundaries of the city is the only method of rectifying the wrong that has occurred.

There is, of course, no absolute method of restoring the plaintiff class to the position in which they would have been as of the Councilmanic Election of 1970, but for the defendants' misconduct. Nevertheless, the Councilmanic Election of 1970 is tainted and new elections are called for.

■ Plaintiffs, insisting on a so-called de-annexation decree, argue that a new election of all elected officials of the city is required. They overlook the gist and prayer of their complaint, as well as the fact that the evidence before the Court shows that the found misconduct was directed exclusively to the City Council election. As heretofore stated, any additional white voters would have resulted in a dilution of the Negro vote. Plaintiffs' complaint, and justifiably so, is that the motives of the defendants were directed to securing control of council and it is to that alone that the relief should be granted.

Defendants, after some prodding by the Court, suggested two remedies—one being a modified ward/district-at-large plan. This suggestion envisions the election of five representatives from five separate districts and four from at-large. Their second admittedly reluctant suggestion is an election of nine representatives from nine single member districts.

Under the existing system of Council elections, all members are elected at large.

■ Regardless of the deficiencies of the election of 1970, the Court ought not to ignore the mandate of the City Charter regarding councilmanic elections.[6] Accordingly, the Court's efforts to formulate appropriate relief commenced with a view to doing so as consistent with the present method of election as would comply with the need to rectify as reasonably practicable the plaintiff-class' constitutional deprivations as found by the Court.

■ The deficiencies of an all at-large election are obvious.

■ Plaintiffs' suggestion of an election limited to residents of the pre-annexed area is admittedly inappropriate short of de-annexation.

■ The defendants' suggestion of a five-four modified ward/district-at-large election is, in the Court's opinion, too far

6. City Charter § 3.01 calls for nine council members to be elected from the city-at-large, for a term of two years.

removed from the method in effect in 1970, as is the nine ward system, for the purposes of the instant remedial action.

JeRoyd W. Greene, Jr., as amicus, sought and was given leave to file a proposed remedial plan. Amicus suggests the dividing of the city into two districts, one of which would comprise the pre-annexation city, which would elect seven members to council, and the other district to comprise the annexed area which would elect two members.

The Court is appreciative of Mr. Greene's tendered assistance and, while concluding that such a plan would be violative of the requisite one man, one vote concept, see Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961), by reason of the population disparities existing between the suggested districts, the plan does offer the genesis of a reasonable solution and conforms in a reasonably degree to the City's charter requirements.

As the Court has previously stated, no remedy including de-annexation can precisely restore the plaintiffs' class to their pre-1970 voting position.

■ Before enunciating the specifics of the Court's view as to appropriate relief, it should be kept in mind that all constitutional deprivations are not subject to or capable of relief. Examples are numerous.

■ The Court proposes, therefore, to require new councilmanic elections at the earliest practicable date, the new Council to be elected from two districts, one of which will consist of that area comprising the pre-annexation city excepting for that area encompassed in the 1970 United States Census Tract Numbers 608 and 609, and Block 3 of Census Tract 607, from which there will be elected seven councilmen. The other district from which two councilmen will be elected shall comprise the annexed area and the area delineated as Census Tracts 608 and 609 and Block 3 of Census Tract 607.

The pre-annexed City of Richmond had a population of 202,359 of whom 98,152 were of the White race and 104,207 of the Black.

The annexed area brought to the city a population of 45,705 Whites and 1,557 Blacks, for a total of 47,262. Adding the population of Tract 608 (5,351, of whom 5,089 are White and 262 Black), and Tract 609 (1,793, of whom 1,520 are White and 273 Black), as well as Block 3 of Tract 607 (1,018, of whom 998 are White and 20 Black), to the annexed population, gives a total district population of 55,424, of whom all but 2,112 are of the White race; of the 2,112 members of the Negro race, only 555 are residents of the pre-annexed area and quite obviously not all of those are members of the aggrieved class.

The Census Tracts utilized are areas adjacent to the annexed area and reasonably similar to the characteristics of the annexed population.

A total population of 249,621, of whom 143,857 are White and 105,764 are Negro, reside in the present city. A perfect mathematical balance would dictate that there be a population of 22,735 for each elected councilman. Therefore, a district which will elect seven should theoretically have a population of 194,145 —under the Court's plan there will be a population of 194,197. A district which will elect two should theoretically have a population of 55,470—under the Court's plan there will be 55,424.

Admittedly some few members of the plaintiff class will fail to achieve the full benefit of the remedy proposed. While this is regrettable, as it is that those class members who reside in the pre-annexed area will at the best receive only an opportunity to vote for seven instead of nine councilmen, equity and reasonableness requires at least that sacrifice.

The Supreme Court has approved not only remedial decrees which were constitutionally imperfect, but has in addition approved actions of trial courts in re-

fusing to act under certain circumstances pursuant to equity principles and which permitted operation of unconstitutional conduct. See Roman v. Sincock, 377 U.S. 695, 711, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1963); Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Wells v. Rockefeller, 394 U.S. 542, 547, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1968).

■ The failure to afford equal and exact relief to each member of an aggrieved class is not a disparagement of constitutional guarantees embedded in the Fourteenth and Fifteenth Amendments, which guarantees, as in the instant case, have been violated as to the plaintiff class.

■ True, the political franchise of voting has been described as a fundamental political right because it is "preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1885). Each amendment, and understandably so, is to the person or persons directly affected that which is considered the most valued.

School desegregation cases are prime examples of Fourteenth Amendment rights having been violated and in which the courts in decreeing a remedy must mandate those that are reasonable. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970). Such remedies are not always equally effective as to each member of the class involved.

No less in this case must the Court decree that which denotes the basic fairness in equity—fairness not only to the aggrieved class but to all of the citizens affected by any decree.

■ This Court must examine the exigencies of the situation before formulating relief, and the Court's duty in this regard rests on two considerations. First, the constitutional rights of plaintiffs not to have their votes impermissibly diluted must be accorded, see Reynolds v. Sims, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1963); *Gomillion, supra,* and if possible by the ap-

propriate legislative body. Second, this should be accomplished within the ambit of the public interest that is involved in allowing the political and governmental process to function in a manner so as to do as little harm as possible to other areas and functions for which the particular legislative body is responsible. See Toombs v. Fortson, D.C., 241 F. Supp. 65, 71 (1965), 384 U.S. 210, 86 S. Ct. 1464, 16 L.Ed.2d 482.

It appears to the Court that, especially when viewed as a remedial device, the Court's plan passes the requirement of affording the qualified voters full and effective participation and an equally effective voice in the election of members of the City Council. See Reynolds v. Sims, *supra,* 377 U.S. at 565, 84 S.Ct. 1362, 12 L.Ed.2d 506. Hopefully there is nothing in the Court's plan which, objectively viewed, operates to minimize or cancel out the voting strength of racial elements of the voting population. See Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

■ The United States Supreme Court in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), points out that multi-member districts are not per se constitutionally defective. It is those voting schemes as in the instant case which have been conceived or operated as purposeful devices to further racial discrimination for which the courts have been especially watchful. Surely it cannot be said that the Court's instant plan has been designed to dilute the vote of any citizen. The United States Supreme Court has stated in its view that experience and insight have not yet demonstrated that multi-member districts are inherently invidious or violative of the Fourteenth Amendment.

The Court's plan gives rise to the unequivocal conclusion that the White voters of the annexed area will control the election of the councilmen from their district. Even if the Court were to go

to the single member district throughout the entire city that situation would be present in the annexed area.

Under the Court's plan the pre-annexed city voters will be about equally divided.

Once again the Court points out that the contemplated plan is of a remedial nature.

This cause will be kept before the Court for such further action as may be requisite. The evidence indicates that in any event a new plan for the election of council members has been considered by the present council as well as by the Attorney General of the United States. There is reason to believe that the newly elected council obviously will, in an effort to comply with the requirements of the Voting Rights Act, consider further suggested plans for the election of council members.

Any change in the Charter of the City of Richmond will require action by the Virginia General Assembly, which will convene in sufficient time prior to the next general councilmanic election to consider any proposed changes as may be suggested by the City Council.

It is obvious that the suit not having been commenced in time for truly effective judicial intervention,[7] the Court has had to formulate a remedy which admittedly is the lesser of two evils. The Court is satisfied, however, that the remedy selected does not fall short of constitutional standards. The task of formulating appropriate election procedures is primarily a matter for legislative consideration and determination. An opportunity to so do is now afforded to the City Council. Should they fail to do so according to federal constitutional requisites in a timely fashion, further judicial intervention will be appropriate.

An order consistent with this decree will be entered.

7. See Ely v. Klahr, et al., 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (June 7, 1971).