**Curtis HOLT, Sr., Appellee,**

v.

**CITY OF RICHMOND et al., Appellants.**

**Curtis HOLT, Sr., Appellant,**

v.

**CITY OF RICHMOND et al., Appellees.**

**Nos. 71–2185, 71–2186.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 10, 1972.

Decided May 3, 1972.

Certiorari Denied June 26, 1972. See 92 S.Ct. 2510.

**1094**

basis of a division of the City into voting districts of unequal size, the predominantly white voters of the small district electing two councilmen and the voters in the remainder of the city, containing a majority of blacks, electing seven. He also enjoined present incumbents from interfering with efforts of their successors to amend the City's charter to provide some such device for subsequent elections. The relief granted occasioned the City's appeal.

We think the "unconstitutional motivation" too remote from the judicial annexation decree, which firmly rested on non-racial grounds, to warrant a grant of any relief.

Horace H. Edwards and John S. Davenport, III, Richmond, Va. (Conard B. Mattox, Jr., City Atty., Daniel T. Balfour, Asst. City Atty., City of Richmond, and Thomas E. Crosley, Jr., Matthew N. Ott, Jr., and Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellants in No. 71–2185 and for appellees in No. 71–2186.

W. H. C. Venable, Richmond, Va. (John M. McCarthy, Richmond, Va., Thomas F. Coates, III, and Everette G. Allen, Jr., Richmond, Va., and Venable & McCarthy and Hirschler & Fleisher, Richmond, Va., on brief), for appellee in No. 71–2185 and appellant in No. 71–2186.

Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL and FIELD, Circuit Judges, sitting en banc.

HAYNSWORTH, Chief Judge:

We are met with the problem of the effect of "unconstitutional motivation" on the part of certain officials of the City of Richmond in agreeing with officials of Chesterfield County upon a settlement of an annexation proceeding. The District Judge, 334 F.Supp. 228, did not invalidate the annexation, which occasioned the plaintiff's appeal, but he ordered a councilmanic election on the

In Virginia, cities and counties are mutually exclusive. The area embraced within a city's limits is not a part of a county. Cities expand at the expense of the territory of an adjacent county, and Virginia has provided a judicial procedure as the means for extending the limits of cities.

Under the Virginia procedure, a city wishing to expand its territory must file an action in the Circuit Court of the county containing the coveted area. A special court of three judges is constituted; evidence is taken and the court decides whether or not some annexation is to be decreed. If some is to be ordered, the court fixes the new boundary between city and county and determines an amount of money to be paid by the city to the county for schools, utilities and other improvements which had been built and installed by the county. A city may reject such an award, but if it accepts it, the area defined in the decree, by virtue of it, is effectively detached from the county and annexed to the city as of the following January first.

Within this framework, after an abortive effort to merge the City of Richmond and Henrico County in 1961, Richmond, in January 1962, instituted judicial proceedings for the annexation of

portions of Henrico and Chesterfield Counties.

The Henrico County case, in the Circuit Court of that County moved first, but not hastily. After the disposition of several motions and the denial by the Virginia Supreme Court of Appeals of writs of prohibition,[1] the trial began in June 1963. There was a decree in April 1964 awarding 16.16 square miles to Richmond. That part of Henrico County was inhabited by 45,310 people, of whom 98.5 per cent were white. After further proceedings, the amount to be paid by Richmond was fixed at 55 million dollars.[2] Because of the amount of that award, Richmond rejected it and abandoned the Henrico annexation proceeding.

The City of Richmond then concentrated on the Chesterfield case, pending in the Circuit Court of that County. An order granting a motion to dismiss was filed in March 1966, but was reversed, and the proceeding reinstated by the Virginia Supreme Court of Appeals.[3] After further pretrial proceedings, the formal trial began in September 1968 and proceeded until January 9, 1969 when one of the judges disqualified himself and a mistrial was declared.

After the Court was constituted, Mayor Bagley of Richmond and Chairman Horner of the Board of Supervisors of Chesterfield County resumed settlement negotiations which earlier had been unproductive. In May 1969, they reached an agreement on a new boundary line and in June, on the amount of money to be paid by Richmond for the annexed area. The agreement, which also included a provision that the County would take no appeal from the annexation decree, was approved informally by a majority of Richmond's councilmen.

The judges and the lawyers all recognized that the settlement agreement was not binding upon the court. The statute[4] requires judicial determination of the new boundary and appropriate compensation. Moreover, civic associations of Chesterfield County had intervened in the proceedings, and the intervenors did not subscribe to the settlement agreement. Thus, additional evidence, principally that which the intervenors wished to introduce, was taken, and the proceedings were concluded. The judges were obviously influenced by the settlement agreement for their annexation decree was in conformity with it.

The intervenors sought review by Virginia's Supreme Court of Appeals, but that court denied a writ of error on November 26, 1969, so that the decree became effective on January 1, 1970.

The District Court's grant of relief had as its foundation a finding that the settlement agreement was the product of racially oriented motivation. That finding rested principally upon the fact that everyone knew that the black population of Richmond had been growing, while the white population had been declining, and the further fact that by 1969 the blacks were no longer the minority and, without an infusion of new white voters, probably could control the councilmanic election scheduled to be held in 1970. The finding was also thought to be supported, to a lesser extent, by findings that a minority of the members of the Council had made extra-legislative statements of opposition to a black take-over of Richmond's government.

If legislative motivation is ever relevant, it surely is to be doubted that it may be proven by evidence of extra-legislative declarations of a minority of its

1. King v. Hening, 203 Va. 582, 125 S.E. 2d 827.

2. In addition to the payment to Henrico County representing the value of existing improvements, the monetary award included the cost of other improvements

which the decree required Richmond to effect.

3. City of Richmond v. County of Chesterfield, 208 Va. 278, 156 S.E.2d 586.

4. 3 Va.Code Ann. (1964 Repl.Vol.) § 15.1–1041(b).

members made in the context of partisan politics. We need not pause to explore that matter, however, for the District Judge said he attributed little weight to such statements, and it seems clear that he would have made the same findings without such evidence.

There were other subordinate findings.

First, there was a finding of "concern" on the part of officials of the City of Richmond, of Chesterfield County, and of the State "that the City of Richmond not become a city of the old, the poor and the Black." There is nothing sinister in such concern. It is simply recognition in Richmond of a problem common to most of our cities throughout the United States. As the more affluent residents move to suburbs, central cities encounter a multitude of problems, including a declining tax base with which to support services for which there is an ever increasing demand. Where it is practical, an obvious and traditional answer has been extension of the city's boundaries to encompass developing residential and industrial areas.

Second, the District Judge found that some, but not all, of those who expressed such concern were "inspired" by fear of a shift in control of Richmond's City Council. This is similar to the finding that some of the members of the Council were fearful of the results of the 1970 elections if there was not an infusion of new white voters.

In city political affairs, there were two contending factions. One known as "Richmond Forward" had the support of a majority of the white voters in the city. Of the nine members of the Council in 1969, six had been elected with the endorsement and backing of that group. The other faction known as "Crusade for Voters" had a wide appeal among Negro voters. Three members of the 1969 Council had been elected with the endorsement of that faction. The political leaders of the two factions conducted themselves as leaders of political parties

do. We have no reason to doubt that the leaders of the "Richmond Forward" group entertained some fear that they and their party might be turned out of office. This, however, is the natural reaction of politicians in the face of an apparently growing strength of an opposing political party.

This concern about the results of the 1970 election had an immediate relevance to the annexation suit. The three councilmen elected with the support of the "Crusade" openly opposed any annexation. It was thought that this would be the position of other councilmen elected with the support of the "Crusade," and that if the "Crusade" could elect a majority of the Council in 1970, and the annexation had not by then been effected, all of the prolonged and strenuous efforts to enlarge Richmond's boundaries would have been frustrated.

Thus, one who felt that enlargement of Richmond's limits was a matter of great importance would have been concerned about the outcome of the 1970 election without the need of attribution to him of any covert or evil motive.

There was an ancillary finding that the three "Crusade" members of the Council were not brought into the informal discussions held in May and June, 1969. The fact is of little consequence, for there was nothing calling for action of the Council at that time. It was necessary to know whether an annexation decree entered in accordance with the agreement would be rejected by a majority of the Council. Informal consultations to discover the answer to that question were naturally conducted by those favoring some annexation. There was no need to consult the three who were opposed to any annexation for it was known they would not support a compromise agreement, whatever its terms.

The District Judge also seemed to attribute some significance to the fact that, as part of the agreement, Chester-

field County agreed not to take an appeal from the annexation decree. This seems questionable, since as parties to litigation undertake to compose their differences, they necessarily agree to forgo further litigation. The agreement, of course, did not foreclose an appeal by the intervenors, and the intervenors actually sought a writ of error. It was denied, however, and the litigation was finally concluded before the end of 1969, so that the annexation decree became effective on January 1, 1970. As to Chesterfield County, however, its agreement not to appeal, as the informal agreement of a majority of Richmond's councilmen not to reject the annexation decree, was a logical, if not an essential, ingredient of any agreement. Its presence does not alter the coloration of the activity.

The essence of the findings then may be summarized in context.

In 1961 there were compelling reasons for annexation of portions of Chesterfield County. Negroes were then a minority in Richmond and no one was then thinking in terms of a possible cleavage between black and white voters. Race was not a factor in the decision to seek annexation. Indeed, the finding was that, without the settlement agreement, the annexation court would have awarded more territory, and a larger preponderance of white voters, to Richmond.

Long before 1969, the annexation court had urged the parties to seek agreement. They had sought some agreement, but such negotiations were unsuccessful until 1969. By 1969, the District Court found a majority of Richmond's Council was willing to accept a smaller area with fewer people than earlier they would have. That willingness, to the extent it was not a product of natural weariness with judicial proceedings commenced more than seven years earlier, was influenced by a sense of urgency that forces opposed to any annexation might succeed in gaining control of a majority of the Council.

Because the opposing forces were thought to be black and the blacks were close to attaining an electoral majority, the motivation of a majority of Richmond's councilmen in supporting a settlement in 1969 was thought by the District Court to be an invidious dilution of black voting power. Though such a settlement earlier, with a larger infusion of white voters, would have been unassailable, an agreement in 1969 to accept fewer white voters and to pay a larger sum to Chesterfield County than it might have paid earlier warrants an inference of racial discrimination, so the District Court found.

The District Court recognized, however, that there was no racial motivation in the institution of the annexation proceeding or in its prosecution. If some members of Richmond's governing body had developed a sense of urgency because of the growing number of black voters and their supposed opposition to any annexation and the election of "Richmond Forward" candidates, no such thoughts were believed to have infected the minds of the judges of the annexation court. In fact, the District Court found that annexation rested upon such firm non-racial grounds that it was necessary, expedient and inevitable.

For such reasons, the District Court did not invalidate the decree of the annexation court. Instead it sought to provide some compensation for the timing of the decree by ordering districting of voters, placing enough of them in one almost all white district to insure a black majority in the other district which would elect seven of the nine councilmen.

There are exceptional cases in which courts have stricken legislative action when its sole or clearly dominant purpose was both obvious and constitutionally impermissible. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 was such a case. There a state statute redrew the boundaries of the City of Tuskegee, Alabama. Earlier, its

boundaries had formed a perfect square, but the statute carved out of that square "a strangely irregular twenty-eight-sided figure" with the result of removal from the city of "all save only four or five of its 400 Negro voters while not removing a single white voter or resident." The facts were "tantamount for all practical purposes to a mathematical demonstration" that the sole purpose of the legislation was to segregate the voters by race and to deny to former black residents the right to vote in municipal elections.

When the legislative purpose is not both obvious and constitutionally impermissible, however, the cases uniformly hold that facially constitutional legislation may not be stricken because of suspect legislative motivation. As long ago as 1810, Chief Justice Marshall recognized the principle in a case [5] in which a Georgia statute was attacked on the ground its enactment had been procured by bribing the legislators. Chief Justice Marshall said for the Court:

> "It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, to the formation of a contract by that power, are examinable in a court of justice. If the principle be conceded, that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?

> "If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned."

More recently the Court, through Chief Justice Warren, spoke to the principle in a case [6] in which a congressional act was attacked for having as its purpose the suppression of free speech. He said:

> "Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it."

Most recently, the Court considered the problem in Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438.

---

5. Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130, 3 L.Ed. 162.

6. United States v. O'Brien, 391 U.S. 367, 383–384, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672.

Though it might have been reasonably concluded that the sole and obvious purpose of the closure of the municipal swimming pools was to defeat integration rather than the conservation of municipal funds, a majority of the Court declined to do it. Speaking through Mr. Justice Black, it said:

"But no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it. The pitfalls of such analysis were set forth clearly in the landmark opinion of Mr. Chief Justice Marshall in *Fletcher v. Peck,* 6 Cranch 87, 130 [3 L.Ed. 162] (1810), where the Court declined to set aside the Georgia Legislature's sale of lands on the theory that its members were corruptly motivated in passing the bill.

"A similar contention that illicit motivation should lead to a finding of unconstitutionality was advanced in *United States v. O'Brien,* 391 U.S. 367, 383, [88 S.Ct. 1673, 1682, 20 L. Ed.2d 672] (1968), where this Court rejected the argument that a defendant could not be punished for burning his draft card because Congress had allegedly passed the statute to stifle dissent. That opinion explained well the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment. * * * It is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators. Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters. If the law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or rele-

vant governing body repassed it for different reasons." [7]

Here there is no affirmative legislative act under attack. What is attacked is the Council's failure to reject the annexation award and the informal participation of some councilmen in an agreement which hastened the conclusion of the tediously prolonged litigation. If that be the equivalent of legislative action, the cases in the Supreme Court require that it not be stricken.

For perfectly valid reasons, Richmond's elected representatives had sought annexation since 1961. Those reasons were compelling, so much so that, as the District Court found, annexation was "inevitable." For those reasons, and for those reasons alone, settlement negotiations had been undertaken, and the court had encouraged and prompted them. If they were not fruitful earlier, there is no suggestion anywhere that the legitimate reasons for compromise did not wax in strength as the litigation extended into its eighth year. There is no finding, and the record would not support such a finding, that any councilman who did, or did not do, anything in 1969 was not motivated by the same purposes which led to the institution of the annexation proceeding in 1961 and recurrent attempts to reach a settlement agreement in the intervening years. If some impermissible reasons crept into the minds of some members of Richmond's Council in 1969, that cannot negate all of the compelling reasons which led them and their predecessors in office to press on the same course in earlier years.

We do not have here the dubious situation presented in *Palmer* or *O'Brien* in which the sole legislative purpose may have been impermissible. We do not have a case in which the legislative process was infected by corruption as in *Fletcher v. Peck.* What was done or not done had strong and legitimate reason. Under these circumstances, it far surpasses judicial power to strike down leg-

7. Palmer v. Thompson, 403 U.S. 217, 224–225, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438.

islative action because some of the legislators may have been motivated by some impermissible reason in addition to those acknowledged permissible and legitimate reasons, found by the District Court, in effect, to be compelling, and which had set them on their consistent course.[8]

Under the circumstances, no violation of any Fifteenth Amendment right was worked by the annexation, effected, as it was, by the decree of the state court.

 At the request of the parties, we have proceeded to hear and decide the Fifteenth Amendment questions, notwithstanding the fact that the Attorney General has filed an objection under the Voting Rights Act of 1965. We have no jurisdiction to consider any problem arising under that Act,[9] and what we have said reflects no opinion as to the appropriateness or inappropriateness of the Attorney General's objection.

Reversed.

BUTZNER, Circuit Judge (dissenting):

I dissent because Virginia's annexation laws,[1] though fair on their face, were deliberately used to debase the votes of the black citizens of Richmond. It is no longer open to dispute that a state or one of its political subdivisions is prohibited from changing political boundaries to intentionally dilute the weight of the votes of black citizens.

The fifteenth amendment to the United States Constitution provides, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." In Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the Court held that the amendment prohibited the Alabama legislature from redefining boundaries so as to remove all but four or five of Tuskegee's 400 black voters, while not removing a single white voter. Mr. Justice Frankfurter stated the principles which are controlling here: "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." Quoting from earlier cases, he emphasized that "Acts generally lawful may become unlawful when done to accomplish an unlawful end. . . . " 364 U.S. at 347, 81 S.Ct. at 130. Relying on *Gomillion*, in Perkins v. Matthews, 400 U.S. 379, 388, 91 S.Ct. 431, 437, 27 L.Ed.2d 476 (1971), the Court pointed out that annexation "dilutes the weight of the votes of the voters to whom the franchise was limited before the annexation, and 'the right of suffrage can be denied by a debasement or dilution of the weight of the citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' " [2]

---

8. For additional discussion of the problems involved in judicial analysis of motivation, see Bickel, The Least Dangerous Branch, 202–221; Brest, Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive, The Supreme Court Review, 1971, 95; Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1217, 1218; The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 86–95.

9. 42 U.S.C. § 1973c.

1. Va.Code Ann. §§ 15.1–1032 et seq. (Repl. vol. 1964, Supp.1971).

2. *Matthews* dealt with § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1970), and at oral argument we were advised that the Attorney General of the United States has filed an objection under the Act to the annexation because it dilutes the rights of black voters. His opinion is not subject to review in these proceedings, but the Supreme Court's observations about annexation are instructive because the Act was passed to enforce the fifteenth amendment. *See* South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

The City of Richmond does not seriously challenge the principles stated in *Gomillion* and *Matthews*. Instead, citing Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); and Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), it claims that the federal judiciary is prohibited from examining the motives that prompted annexation. Undoubtedly these cases state a sound general rule, but there are exceptions. The Court has never hesitated to declare unconstitutional deliberate acts done under color of state law to deny or abridge rights secured by the fifteenth amendment. It would be anomalous indeed if the amendment prohibited direct impediments to the franchise while simultaneously sheltering abridgment that is accomplished by devious and indirect means.

The city's position was squarely rejected in *Gomillion*, where the Court said that a similar argument "would sanction the achievement by ·a State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions. 'It is inconceivable that guarantees embedded in the Constitution of the United States may thus be manipulated out of existence.'" 364 U.S. at 345, 81 S.Ct. at 129. In an earlier case that invalidated a voter registration requirement that appeared neutral on its face, but in actuality was a pitfall for black citizens, the Court held that the fifteenth amendment "nullifies sophisticated as well as simple-minded modes of discrimination." Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939).[3]

Deliberate attempts to subvert other fundamental rights have not been insulated from judicial inquiry. Only this term, Mr. Justice White reiterated that "the State [can]not *deliberately* and systematically deny to members of [a defendant's] race the right to participate as jurors in the administration of justice." Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (emphasis added). And the Court, in Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936), invalidated a tax on newspapers that was "seen to be a *deliberate* and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guarantees." (Emphasis added.)

We are not in this case concerned with the constitutionality of Virginia's annexation statutes or the motives behind their enactment. The issue is whether officials of the City of Richmond employed the statutes to deliberately dilute the votes of the city's black citizens. I believe, therefore, that the

---

3. South Carolina v. Katzenbach, 383 U.S. 301, 311, 86 S.Ct. 803, 810, 15 L.Ed.2d 769 (1966), catalogs devices "designed to deprive Negroes of the right to vote" in violation of the fifteenth amendment. "Grandfather clauses were invalidated in Guinn v. United States, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340], and Myers v. Anderson, 238 U.S. 368, [35 S.Ct. 932, 59 L.Ed. 1349]. Procedural hurdles were struck down in Lane v. Wilson, 307 U.S. 268, [59 S.Ct. 872, 83 L.Ed. 1281]. The white primary was outlawed in Smith v. Allwright, 321 U.S. 649, [64 S.Ct. 757, 88 L.Ed. 987] and Terry v. Adams, 345 U.S. 461, [73 S.Ct. 809, 97 L.Ed. 1152]. Improper challenges were nullified in United States v. Thomas, 362 U.S. 58, [80 S.Ct. 612, 4 L.Ed.2d 535]. Racial gerrymandering was forbidden by Gomillion v. Lightfoot, 364 U.S. 339, [81 S.Ct. 125, 5 L.Ed.2d 110]. Finally, discriminatory application of voting tests was condemned in Schnell v. Davis, 336 U.S. 933, [69 S.Ct. 749, 93 L.Ed. 1093]; Alabama v. United States, 371 U.S. 37, [83 S.Ct. 145, 9 L.Ed.2d 112]; and Louisiana v. United States, 380 U.S. 145, [85 S.Ct. 817, 13 L.Ed.2d 709]." To these cases may be added Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969), which voided discriminatory enforcement of a corrupt practices law against Negro candidates.

district court did not err in examining every facet of the annexation case to determine whether, under the cloak of annexation, the city's black citizens were intentionally deprived of the rights secured to them by the fifteenth amendment.

Virginia's annexation laws grant broad discretion to an annexation court. Essentially, the court is required to determine "the necessity for and expediency of annexation." Va.Code Ann. § 15.-1–1041.[4] It never has been suggested that a proper function of annexation was to redress any supposed imbalance between the black and white voters of a city.

A number of facts are uncontradicted. Near the end of an annexation case that proceeded intermittently for approximately eight years, Richmond and Chesterfield County officials reached agreement on the terms and conditions of annexation. The agreement was promptly presented to the court which adopted it verbatim in its decree. By statute, an annexation becomes effective on January 1 following a final decree. Thus, if the people annexed from Chesterfield were to vote in the June 1970 election for city council, the annexation case, including appellate review, if any, had to be terminated before December 31, 1969. The plaintiff claims that the compromise was deliberately timed and designed to enfranchise additional white voters for the 1970 election. The city denies the allegation.

There can be no doubt that Richmond's annexation of a portion of Chesterfield County diluted the vote of black citizens who resided in Richmond before annexation. Black citizens constituted 51.5 percent of Richmond's population before annexation. The annexation decree added 47,262 people, of whom only three percent were black, By this means the city's erstwhile majority of black citizens was reduced to a minority of 42 percent of the total population. These facts standing alone, however, would not entitle the plaintiff to prevail. *See* Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). But he proved much more. He established that through private meetings, from which members of city council who opposed annexation were excluded and to which the public was in no way privy, the city officials deliberately devised a means for increasing the white population under the guise of acquiring additional land for metropolitan expansion. Based on this evidence, the district court found that the compromise was a "purposeful device" to dilute the vote of Richmond's black citizens. From the evidence, I am satisfied that this finding was not clearly erroneous.

Negotiations between the city and the county for settlement of the annexation suit had been conducted from time to time over a period of many years. However, until the spring of 1969, when the annexation trial was in progress, little had been accomplished. The compromise which termed the suit was negotiated

---

4. This phrase was construed by the Supreme Court of Virginia in County of Fairfax v. Town of Fairfax, 201 Va. 362, 111 S.E.2d 428, 432 (1959), as follows:

"In determining whether annexation is necessary and expedient for a city or town, factors to be considered are its size, its crowded conditions, its past growth, its need in the reasonably near future for development and expansion, the health of the community, whether the terms proposed are reasonable, fair and just, and whether proper provision will be made for future management,

. . . the result of the development promised by the combination of the resources of two urban communities under a single political unit in the light of the best interests of the State, the town, or city, the county, and the territory proposed to be annexed, . . . community of interest, if any, between the town or city and the area proposed to be annexed, . . . and financial ability of the town or city to provide for development after annexation. . . ."

almost entirely between the then Mayor of the city and the Chairman of the Board of Supervisors of Chesterfield County. In the district court, at the trial of the case we are now reviewing, the Mayor resolutely maintained that he had supported the annexation to enlarge the city's boundaries for industrial and business development and to strengthen the city's finances by taxes derived from this expansion.[5] He emphatically denied that a desire for new voters was a reason for the compromise,[6] and that the councilmanic elections in June 1970 had any bearing on the timing of the annexation.[7]

Quite a different account of the city's goal was given by the county's chief negotiator, the Chairman of its Board of Supervisors. He testified that as early as 1965 one of the city's councilmen and an attorney for the city met with him to explore the possibility of settling the annexation suit before trial. At that time the city's representatives did not talk about land, roads, schools, or utilities. They told him they "needed 44,000 leadership type of white affluent people," and were particularly interested in the number of black citizens in a 51 square mile area they were proposing to take.[8] No agreement was reached at this meeting. The Chairman of the Board of Supervisors met again with representatives of the city at least twice in 1968. At these meetings, Richmond's newly elected Mayor, who ultimately became its chief negotiator, was present. Again the negotiations revolved around the number of people and from where they were to come. The Chairman testified that the city representatives did not reveal how much vacant land they wanted, how many schools they wanted, or what facilities they needed. They did not discuss the assessables or the percentage of

---

5. The Mayor testified that he supported annexation for the following reasons:

"Because I was firmly convinced from my observation and from subsequent service on Council that the boundaries of Richmond had to be expanded. It was an old city. We had to go to any available space for industrial, business development. Some of the area that remained appeared to be open but it was not usable because of flooding, things of that sort. I felt we had to expand the boundaries of Richmond because I don't think you can be on Council long without it being abundantly clear that the demands and needs of the city are ever increasing, speaking of finances, and that the resources do not increase likewise on the same ratio. You have got to get funds to provide city services, the police, fire department, schools, safety, and the demand for money had become so great the average citizen cannot continue to bear the tax burden. You have to look for business to help bear this great tax burden. We could not expand our business operations. We did not have any area in which to locate. We had to look for other areas for expansion."

6. The Mayor testified,

"I was not particularly interested in voters. When you sit down to work up a budget for the City of Richmond, I don't think you can pay off people with voters. You have got to have dollars and cents. That is what I was looking for, dollars and cents."

7. When asked, "Did the councilmanic elections in June 1970, have any bearing on wanting to have this annexation effective?," he responded,

"No, sir. You had to have an annexation agreement or whatever. It had to be effective sometime. They had many Councilmanic elections since I have been trying to expand Richmond."

8. The Chairman testified:

Q What did they [the city's representatives] talk about?
A They talked about people.
Q Did they talk about votes?
A I am sure in this discussion votes were talked about.
They asked us in the fifty-one square mile area approximately how many black citizens were in this area. I had no definite census, but it was estimated about five percent of the area of fifty-one square miles were black and about ninety-five percent were white.
Q When they discussed people, were they discussing a need for 44,000 white people or 44,000 black people?
A Well, in that area, they had to be talking about the ratio I just mentioned.

industrial land they required. At the final meeting of that year, the Chairman testified, he had hoped the city would withdraw what the county considered unreasonable demands. As before, the demands turned out to be simply for people.[9]

After several delays and one mistrial, the annexation trial resumed in the spring of 1969, and meetings between the Chairman of the Board of Supervisors and the Mayor quickened. About May 1, the Mayor and the Chairman met again. The Mayor then indicated the number of people he wanted from an area he pointed out on a map he had brought along. There was no talk about vacant land, schools, utilities, or roads. In the words of the Chairman of the Board, "We were talking about where an area would be, or possibly be, to encompass the number of people they said they needed to accomplish their desires and for settlement, for a compromise settlement." Ninety-five percent of the people in the area the city designated were known to be white, and five percent black.

At a May 15 meeting between the Chairman and the Mayor, the Mayor was told that it was unlikely that the county board would agree on 44,000 people. The Mayor, on the other hand, reported that he had been in touch with the majority of city council members and he "knew what was on their mind. He knew about what they thought they would agree on . . . and he indicated this was approximately 44,000 people."

At this meeting the annexation line was drawn. The Chairman of the Board of Supervisors was explicit in his testimony concerning it: "I said, let me dictate a line to you of an area that will encompass this many people. You write it down." That line became the final annexation line "except for a couple of minor changes made at the county's request and one at the city's request." The Mayor did not ask about the number of school children; he did not ask about the vacant land in the area. He did, however, ask the Chairman "to verify [with the Executive Secretary of the Board] how many people were in the area of the line we drew. This I did. . . . "

In June, the Chairman and an attorney for the county met with the Mayor and other representatives of the city and agreed that the city should pay approximately $27,300,000 for the area to be annexed. At trial, the Chairman of the Board was asked, concerning the meeting, "Did they [the city's representatives] give you any conditions that went along with this line and a dollar amount, any conditions to the agreement?" He replied,

"They gave the condition—Our purpose of going there was to find out if they meant business and what they said, if they meant it, and if they were willing to stand behind it. They stipulated the condition they would go along with the agreement provided that no appeal was made by the county, and the annexation should take effect January 1, 1970, and the people in this area would be citizens from that date on and would be eligible voters in the Councilmanic election of 1970."

---

9. Concerning a December 1968 meeting, the Chairman of the County Board testified:

Q What were the unreasonable demands?
A 44,000 people.
Q Did they have any unreasonable demands about how much land they wanted?
A No, sir. .
Q Or how much schools they wanted? How many roads?

A They did not discuss them.
Q Utilities? Assessables? The tax base?
A Those items were not discussed except other than to the degree the city people at times, at some of the meetings, indicated they needed land for expansion. The amount or the quantity was not brought up.
Q Were you successful in getting the city to put a line on the map?
A No, sir.

The Chairman's testimony is amply corroborated. The Executive Secretary of the Board of Supervisors, having attended several of the negotiating sessions, stated that the emphasis at the conferences "was always people, the number of people," and that race was discussed. He emphasized that the county representatives "would talk about schools and land, vacant land, for expansion, but [the city's representatives] would always come back eventually to the number of people they needed." He corroborated that on the night the Mayor and the Chairman tentatively agreed upon the annexation line, the Chairman telephoned him, read the line, and "asked me to figure up the exact number of people in that line to ascertain if 44,000 people were in that line." Referring to the June 1969 meeting, he said the city representatives "had mentioned rather pointedly that if we did appeal that the people in the annexed territory would not come into the city on January 1. This was absolutely necessary in order that they could vote in the election of June, 1970."

While the city was demanding verification of the number of people in the tentative area, it was far less concerned about other information essential to an ordinary annexation suit. It had employed a full time boundary expansion coordinator, whose duty was to provide city officials and attorneys data about the area the city was seeking. Not until eleven days after the Mayor and the Chairman of the Board tentatively agreed on the line ultimately approved by the annexation court was the bounda-

ry expansion coordinator told about it and asked to furnish pertinent essential information about the area, including the value of utilities, schools, the amount of the tax assessables, and an analysis of the present and potential uses of the land.

Other witnesses, testifying about extra-legislative declarations of city officials, told of the concern over the likelihood of black voters exercising the balance of power in the 1970 elections.[10] Quite properly, the district judge did not rely on these casual conversations to show the purpose of the compromise. They do, however, strongly corroborate the Chairman of the Board of Supervisors' account of the facts leading to the city's agreement to settle the annexation suit.

Annexation, though not indispensable to a city's economy,[11] is often desirable, and the Constitution should not be so narrowly construed that annexation is foreclosed simply because the racial balance of the city will be altered. City officials faced with a charge that they have violated the fifteenth amendment by annexing adjacent territory should be afforded ample opportunity to rebut the allegations by showing the propriety of the boundary changes.[12] Richmond, however, has not rebutted the plaintiff's proof by showing that the compromise of the annexation case accomplished a legitimate end. Although the city professed that it was seeking vacant land for business and industry, it settled for only 475 acres (.74 of a square mile) of potential industrial land, and 729 acres (1.1 square mile) of potential commer-

10. Some of these declarations were vulgar assertions of white supremacy. Others were specifically directed to worry over the outcome of the 1970 elections. Typical of the latter is the testimony of a member of the General Assembly of Virginia, who had been appointed to a legislative commission to consider expansion of the city's boundaries. He testified that at a commission meeting in July 1968 at Williamsburg, city officials told him "they were concerned that the City Council races in 1970 would go all black."

11. Expansion of Norfolk, the state's largest city, has been blocked by incorporation of adjacent rural areas as cities. More recently, the General Assembly has imposed a moratorium on future annexations of counties by cities. Ch. 712, [1972] Va. Acts (Approved April 10, 1972).

12. *See* generally, Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970).

cial land. Developed industrial and commercial land amounted to even less—312 acres, industrial; and 351, commercial. On the other hand, residential land, of which almost half was already developed, aggregated 12,536 acres, or more than 19.5 of the 23 square miles annexed. Indeed, the population density of the area annexed was so great that the city acquired approximately one-third of Chesterfield's school children and found itself with 3,000 more pupils than its then existing classrooms could accommodate. After annexation, Chesterfield was left with an area of 437 square miles and a population of 77,046. Richmond's area was increased to 50 square miles with a total population of 249,430.

It is idle to suggest there is no large amount of nonresidential land in the county that the city might annex. Both the Mayor and the Chairman of the County Board of Supervisors recognized that industrial sites were available on the James River south of the city, but at the outset of negotiations the Chairman made it plain that annexation of this area was not negotiable. That is not to say, however, that an annexation court would not award the area to the city if it were convinced that the economic well-being of the city would be enhanced. Far from confirming the city's professed reason for its agreement with the county, the description of the annexed area, especially its paucity of vacant commercial and industrial land for expansion, supports the district judge's finding that the compromise was a "purposeful device to further racial discrimination" by diluting the vote of Richmond's black citizens.

The city contends that the improper motives, if any, of its former Mayor cannot be imputed to the annexation court or taint its decree. It points out that the city council never formally considered the compromise and that the court was not bound to accept it. The addition of white voters, claims the city, was caused by judicial action which has not been impugned. This theory, though plausible, does not bear scrutiny. Throughout his negotiations the Mayor did not confer with three members of the council who opposed annexation. Indeed, these three were excluded from secret meetings which other members of council attended, and they were not briefed about the progress of the negotiations. Although he was empowered to do so, the Mayor called no meeting of council to publicly debate the merits of the compromise and to adopt an appropriate ordinance or resolution approving or rejecting it. The city's attorneys were opposed to the settlement that the Mayor and the Chairman of the Board of Supervisors had negotiated, and at a conference in chambers with the annexation court they made their position known and explained their belief that formal council action was necessary.[13]

---

13. The city's chief trial counsel said:

"If it please the Court, I think I should say this as Chief Counsel in the case: I would not want the Court to think that we have been trifling with the sincerity of the witnesses and what we have spoken during the trial of this case, knowing that negotiations were being had.

I, for one, have not met with the Board of Supervisors and I, like my associates here, are opposed to the settlement that has been discussed.

On the other hand, I am sure the Court recognizes that we are in an awkward position with respect to our duties as attorneys. I think the Court ought to know the mechanics through which this will have to go; the City Attorney has alluded to them but he didn't spell them out in detail.

This ordinance has to carry in meticulous detail every fact relating to this compromise, a good many of them, as we pointed out in the conference on yesterday afternoon haven't even been discussed. This has been on a very general basis with the Mayor.

The engineering staff of the City have not been involved and we don't know what the problems are with respect to the utilities, we are not sure what the school problem is. We know that there may be involved about 3000 school children that will be out of quarters under what has been talked about.

All of which means that the Council must have, every single one of them, de-

Nevertheless, the city's attorneys made only a pro forma objection to the admission of the compromise in evidence when it was offered by the county. And, of course, city officials, having previously exacted a promise from the county not to appeal, had no intention of appealing the court's admission of the compromise over the objection of the city's attorneys. The fact that the council was never afforded an opportunity at a public meeting to approve or reject the compromise demonstrates that the Mayor and five of the other members of council, by agreement with the county, were able to thwart the three members who would have opposed the compromise. But this method of proceeding cannot validate the attempt of the Mayor and those who sided with him to infringe the rights guaranteed by the fifteenth amendment. The city is correct in saying the annexation court was not bound to accept the agreement. The fact remains, however, that the court did accept it and adopted it verbatim in its decree.

The evidence does not disclose that the annexation court was told about the city's purpose for compromising the case. The city does not suggest—indeed it cannot—that the annexation court would have approved the compromise had it known of its illegal purpose. The city's failure to make this information available to the annexation court cannot now serve to strengthen the city's position. I am confident that had that court known the facts that were subsequently exposed in this suit, it would not have approved the compromise.

Since a majority of our court has ruled that the annexation is valid, they had no occasion to discuss a remedy. Because I believe the annexation violates the Constitution, I will express my views, though briefly, about appropriate relief. The district judge, impressed by the fact that the annexation case was instituted in 1961 for proper purposes and that annexation to some extent was inevitable, declined to divest the city of the annexed area. He ordered instead a special election in which voters in the original part of the city would elect seven councilmen, and those in the new part, joined by some 8,000 persons who were citizens of the city before annexation, would elect two councilmen. Transferal of the 8,000 citizens was designed to comply with the Supreme Court's "one man, one vote" mandate by properly apportioning the population of the two voting districts. Thereafter, the city council would be elected as its members, or the state legislature, decided.

Although a court of equity has wide discretion in fashioning a remedy, the relief it decrees must be effective to right the wrong with which it deals. United States v. E. I. Du Pont De Nemours & Co., 366 U.S. 316, 327, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961). I believe the district court's remedy is inadequate for several reasons. It does not correct the impermissible conversion of Richmond's black citizens from a majority of the population to a minority. It presupposes that the wrong can be righted by a single special councilmanic election. The problems of cities, however, cannot ordinarily be solved by one election. Change reflecting the will of the electorate is an ongoing process, occurring in the course of many elections and in the light of new information and personali-

tails spelled out in an ordinance to be drafted by the City Attorney. This is required by Charter. Then that has under the Charter to be advertised and after that advertisement, which is a week, then the matter has to come up for public hearing, at which hearing I assume that all who are connected in any responsible position with the case, that the public and the members of the Council would ask them to express their

views about this thing, and then after that's done the vote will be taken.

I don't know what the vote wil be. I have been in these things in Council for so long that I know that there is ofttimes a great many things can happen between the introduction of an ordinance, Judge, and when the public gets it before it and what it will be, that is, Council's action, is something else."

ties. By assigning only two members of council to the newly annexed citizens, the remedy effectively denies them a voice in the city government. It compounds this error by adding some 8,000 persons who were residents of the city before annexation to this group, thereby arbitrarily limiting their voting power. The remedy attempts to redress only the election of city council. It does not encompass the election of other city officials such as treasurer, commissioner of revenue, and city sergeant, who must of necessity be elected on a city-wide basis.

I believe the only adequate remedy is to require Richmond to divest itself of the annexed area. Officials of the county have testified that they would willingly accept return of the area and its citizens and that the county is financially able to reimburse Richmond for expenditures it has made as a result of annexation. Divestiture should not prove more difficult or complicated than annexation. It will restore the voting rights of all Richmond citizens, not only for councilmanic elections but for the election of other important city officials as well.

Divestiture is not intended to freeze the racial composition of Richmond's population. This composition will change freely as white and black people move in and out of the city. Moreover, the relief I would grant is not designed to deny Richmond, or any other city, the right to expand its boundaries through annexation, or otherwise, even though such expansion may adversely affect the voting power of one race or another. Annexation is a legitimate means of improving the economy of a city and the quality of its environment. The Constitution, I believe, does not forbid a city to expand its boundaries, even though enlargement may have the collateral effect of modifying its racial composition. The remedy I suggest is intended to prevent city officials, black or white, from deliberately and intentionally employing annexation laws to dilute the voting rights of any race.

Therefore, I would affirm the district court's ruling that the compromise of the annexation suit violated the fifteenth amendment because it was a deliberate act to dilute the voting rights of black citizens, and I would remand the case for reconsideration of the remedy.

WINTER, Circuit Judge (dissenting):

While I am in agreement with the majority (and in disagreement with Judge Butzner) that the annexation ought not be set aside, I am in agreement with Judge Butzner and the district court that the timing of the annexation and formulation of the annexation settlement were dictated by invidious purposes. Like the district judge, I would undertake to redress the violation of fifteenth amendment rights which were violated thereby, without invalidating the annexation. In formulating relief, the district judge did not, in my view, exceed his discretion, and I would affirm.

Of course, the judicial proceeding for the annexation of a portion of Chesterfield County was undertaken for benign, noninvidious purposes. Had it been allowed to run its course, it would have resulted in an award which, unless rejected by a city council elected in the interim, would have meant that a portion of Chesterfield County was annexed to the City of Richmond. There is no basis in the record to suggest that the extent of the territory to be annexed would have been any less than that obtained under the settlement. Indeed, it was expected to be territorially greater.

But the district judge found that an inescapable consequence of the annexation would be to dilute the black vote in the City of Richmond and to reduce it from a majority position to that of a minority. This was so because Chesterfield County was better than 91% white and Richmond 52% black before annexation. After annexation Richmond would become 58% white and 42% black, since 47,262 new citizens (97% of whom, in the area annexed, were white) would be added to the 104,207 black and 98,152 white citizens (total 202,354) of the pre-annexed city. Moreover, the annexation settlement was negotiated and

made effective on the eve of the 1970 councilmanic election which, under existing law, was to be conducted on a single district, at-large basis. Manifestly, the ability of black voters in the pre-annexed city to vote and to elect candidates on a basis of race was substantially impaired.[1]

Dilution of the ability to vote and to elect on a basis of race would be an effect of any benign annexation since all of the areas surrounding Richmond have a predominantly white population and since it would be impossible, short of the most convoluted drawing of boundaries, to annex land without including people. However, the district judge found that the primary reason why the settlement was formulated and effected *when* it

was, was "to assure an unquestioned white majority for the upcoming Councilmanic Elections."[2] As Judge Butzner has demonstrated, there was an abundance of evidence to support these findings. The opinion of the majority may be read in vain for any adequate discussion of these findings and any demonstration that they are clearly erroneous. Yet they are the crux of the case. The majority simply takes the position that the evidence to support them is extraneous to the issue. Again, as Judge Butzner has conclusively demonstrated, existing case law requires that it be considered; otherwise, fifteenth amendment rights may be erased with impunity.[3]

I cannot subscribe to the thesis, implicit in the majority's opinion, that because

1. This is especially true in Richmond because the district judge found that in 1968 approximately 50% of registered Negro voters voted, while only approximately 30% of white registered voters voted.

2. When the City of Richmond rejected the Henrico annexation award in 1965 because of the prohibitive cost as fixed by the annexation court, Richmond officials sought to negotiate a settlement of the then dormant Chesterfield case on the basis that the City obtain 44,000 new white citizens. The negotiations bore no fruit and the suit proceeded ·for four years before settlement negotiations were begun anew. From the standpoint of the dominant white majority in Richmond, events occurring in the interim provided a new spur to effect a settlement before the 1970 councilmanic election. From the standpoint of Chesterfield County, one can suppose that the progress of the case and the probably ineluctable outcome generated a new receptivity to settlement. In any event, there was a clean break between the discussions in 1965 and their resumption in 1968 and their implementation in 1969.

3. I add some observations to supplement Judge Butzner's discussion of the legal problem:

First, it is impossible to reconcile all of the holdings and dicta of the Supreme Court on the question of the circumstances when it is permissible to consider motive and purpose of members of a legislative body in order to impeach the legislative result. Compare the opinion of Mr. Justice Black, writ-

ing for the majority, with the dissenting opinion of Mr. Justice White, in Palmer v. Thompson, 403 U.S. 217 [91 S.Ct. 1940, 29 L.Ed.2d 438] (1971). See also, Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970); The Supreme Court, 1970 Term. 85 Harv. L.Rev. 3 (1971).

Second, in my view, the Supreme Court's latest expression on the subject, Palmer v. Thompson, supra, would permit resort to the evidence in this case. It is true that such evidence was rejected in Palmer, but Mr. Justice Black's opinion makes clear that this result flowed from the fact that the swimming pool closings did not of themselves deny equal protection of the laws, because there was no constitutional right to have a swimming pool maintained and there was no evidence that segregated pools were being supported or maintained. Distinguishing Griffin v. [County School Board of] Prince Edward County, 377 U.S. 218 [84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), and Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110] (1960), where motive was considered, Mr. Justice Black acknowledged that motive could properly be considered when the facial effect of the enactment was to deny or impair a Fourteenth or Fifteenth Amendment right. The instant case belongs in the latter category; because without recourse to purpose or motive, one can readily see that the effect of the annexation would inevitably be to dilute the black vote. Except as to

annexation in Virginia is effected in part by judicial determination, the decree of the annexation court somehow washed clean the illegal motives and intentions which caused the settlement of the annexation case to be formulated *when* it was and in the form which it took. This is not to say that the judges of the annexation court were privy to the motives of the Mayor and majority councilmen. Clearly, they were not. Indeed, one can only conclude from the record that the annexation court was badly used. Yet, in spite of the fact that the settlement was not binding on the court, there can be no question but that it was the principal, if not the sole reason, why the annexation decree followed the settlement verbatim. The point is best established by reference to the semi-secret portion of the transcript of the annexation case.[4]

After the annexation court, in chambers, was advised of the settlement, Judge Abbott, the presiding judge, counsel and the other judges said the following:

> JUDGE ABBOTT: Well, first I would like to say that we are pleased that you have gotten together and settled your differences. I think it might in the end create good will and harmony between people but I think mechanics is a good question to consider.
>
> . . .
>
> JUDGE ABBOTT: Let me ask this: Instead of taking time out for your Board of Supervisors to approve or for your City Council to approve, either one of them may turn it down and we have lost all this time.

> Why not proceed with your case?
>
> MR. MAYS: Your honor, that's exactly what I was going to suggest.
>
> JUDGE ABBOTT: And let us know what you have agreed on and let us make the decision which will be binding then on the city and county without going through the formality of ordinances and meetings of the Board of Supervisors.
>
> MR. THORNTON: This is what we had in mind your Honor.
>
> JUDGE ABBOTT: Then we can hear the intervenors and let them present their case and we will make our decision then. If we approve what you all have agreed upon, that will be our decision; if we disapprove then, of course, we would say so.
>
> The chances are we are going to approve it but sometimes things come up and you can't approve . . . it would be my suggestion that we just proceed with the case and then when the evidence is in, let us hear the Protestors and *then you can tell us what your agreement is and we can make our decision accordingly, and in that way the Intervenors won't feel like they have been kicked around or left out.* (Emphasis added.)
>
> MR. MAYS: It would certainly be our suggestion your Honor to go forward with the case because, in the first place, it would look pretty odd to recess for three days [the Intervenors had been scheduled to appear in three days] and then get the Intervenors in on Thursday. That would really be odd.
>
> . . .
>
> JUDGE ABBOTT: I don't think we ought to put this in evidence but just

degree, i. e., mere dilution rather than outright denial, this case is like *Gomillion.* Wright v. Rockefeller, 376 U.S. 52 [84 S.Ct. 603, 11 L.Ed.2d 512] (1964), is no impediment to this analysis, because, there, the majority of the Court accepted the district court's finding that New York's redistricting statute had neither the effect of drawing districts on racial lines nor was it motivated by racial considerations.

4. When the dialogue which follows in the text was recorded, the presiding judge requested that it not be transcribed; and if it was transcribed, that it be withheld from the news media. Later the annexation court receded from this position, apparently because the news media had gotten part of the story.

proceed with the trial as if you hadn't been in here.

MR. MAYS: Yes, sir.

JUDGE ABBOTT: Then when the evidence is all in you can submit to us what your agreement is.

. . .

JUDGE ABBOTT: I might suggest that if you have entered into an agreement that the City need not cross examine so extensively as you have.

MR. MAYS: We hadn't planned to, your Honor.

JUDGE ABBOTT: And that would certainly save some time.

. . .

There then ensued some discussion as to the agreement being one that had not formally been passed upon by a meeting of council but only agreed to by six members of the council, with the consequence that the city was not firmly bound:

MR. MATTOX: Judge Marshall, I think this is important. Six members of the Council although it is a matter of record did sit in this room and agree to something, but that does not make it an agreement.

JUDGE MARSHALL: Of course not.

JUDGE ABBOTT: We understand that.

MR. MATTOX: That's the point I wish to make.

JUDGE ABBOTT: That's the point we are making that since you could not bind the Council, if we heard the evidence and then made our decision and we adopted what you say was your settlement, then Council would be bound by it without having to pass a resolution.

. . .

JUDGE MARSHALL: I would like to say, gentlemen, that would hold great weight with me in my decision if it was shown openly [referring to airing the agreement in open court] that the Mayor and six members of the Council had agreed and that the Board of Supervisors had agreed.

I would hesitate to overrule their agreement. .

JUDGE ABBOTT: I think all of us would. . . .

In short, I can only conclude that the exercise of the judicial function was pro forma once the court had determined that on its face the settlement was not so objectionable that judicial blessing should be withheld. Given that the motivation and illegal purposes of the settlement proponents were withheld from the court, this was not the type of judicial decree which should insulate the settlement proponents from the full effect of their wrongdoing.

Where I differ from Judge Butzner is in the form of relief which should be granted. To me this is a case of violation of fifteenth amendment rights superimposed upon a proper, legal annexation proceeding. Since there is no reason to question that some annexation, at least as great in geographical scope, would have been decreed had the proceedings run their course and since, from my reading of the record, there could not have been an annexation of territory without an annexation of people and consequent dilution of the black vote, I approve of the district judge's fashioning relief solely by ordering a new election of council members under conditions where the black vote could not be diluted. Limitation of the remedy to the election of members of the city council, to me, poses no objection. Of course, the black vote would be diluted with respect to the election of city-wide offices, but that result would be inevitable in any annexation of at least that many people. By the same token, dilution of the white vote in the area annexed was inevitable, because any area annexed had a lower density population and the annexed white voters could never retain their majority position. After the special election decreed, succeeding members of the city council would be elected as its members, or the General Assembly, decided; but it must be re-

membered that the Voting Rights Act of 1965, 42 U.S.C.A. § 1971 et seq., applies to the City of Richmond so that whatever succeeding election procedure was devised, it would require the approval of the Attorney General of the United States or the United States District Court for the District of Columbia, under § 1973c, with the result that the voting rights of various blocs would continue to be preserved and protected. In summary, all conflicting claims could never be perfectly resolved in a manner which gave full protection to each, but the district judge clearly did not abuse his discretion in formulating the decree.

For these reasons, I would affirm the district court.