**CITY OF RICHMOND, VIRGINIA,
Plaintiff**

v.

**UNITED STATES of America, and
Richard Kleindienst, Defendants**

**Curtis Holt, Sr., et al. and Crusade for
Voters of Richmond et al.,
Defendant Intervenors**

**Civ. A. No. 1718–72.**

United States District Court,
District of Columbia.

May 29, 1974.

Charles S. Rhyne and David M. Dixon, Washington, D.C., and Daniel T. Balfour, Richmond, Va., for plaintiff.

Gerald W. Jones and Sidney R. Bixler, Attys., Dept. of Justice, for defendants.

W. H. C. Venable and John M. McCarthy, Richmond, Va., for defendant intervenors Curtis Holt, Sr. and others.

James P. Parker and Armand Derfner, Washington, D. C., for defendant intervenors Crusade for Voters of Richmond and others.

Before WRIGHT, Circuit Judge, and JONES and GREEN, District Judges.

J. SKELLY WRIGHT, Circuit Judge:

The City of Richmond, Virginia instituted this action seeking a declaratory judgment, pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1970), that its annexation of approximately 23 square miles of adjacent county land does not have the purpose and will not have the effect of denying or abridging the right to vote on ac-

count of race or color.[1] Richmond subsequently adopted a change in its method of electing its City Council from its previous at-large system to a nine-ward, single-member district plan. The City now requests that we approve under Section 5 the annexation as modified by this ward plan. Under Rule 53(c) of the Federal Rules of Civil Procedure, we referred the case to a Master to hold a hearing and to take testimony on "whether the City of Richmond annexation plan as amended has the purpose or the effect of diluting the black vote in that City." The Master found that the City had failed to carry the burden imposed on it by Section 5 of proving that the annexation, even as modified, did not have such a discriminatory purpose or effect. We conclude that this finding, far from being "clearly errone-

ous,"[2] was compelled by the record before the Master. We therefore decline to grant Richmond the declaratory judgment it seeks.

## I

Before discussing the Master's findings and the record in this case, we think it appropriate to delineate and stress the heavy responsibility placed on this court by Section 5 of the Voting Rights Act of 1965. The origin and meaning of Section 5 were eloquently and thoroughly set forth by Judge Robinson in Beer v. United States, D.D.C., 374 F.Supp. 363 (1974). Judge Robinson's exposition, as well as several previous opinions of the Supreme Court,[3] make clear that our responsibility is no less than to ensure realization of the Fifteenth Amendment's promise of equal

---

1. Section 5, 42 U.S.C. § 1973c (1970), provides:

   § 1973c. Alteration of voting qualifications and procedures; action by state or political subdivision for declaratory judgment of no denial or abridgement of voting rights; three-judge district court; appeal to Supreme Court.

   Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no

person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

2. Rule 53(e)(2), Fed.R.Civ.P., states: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

3. Georgia v. United States, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

participation in our electoral process.[4] Although we need not retrace all of Judge Robinson's comprehensive analysis of the historical evolution of Section 5, in order to gain a full appreciation of our responsibility it is necessary to consider briefly the section's significance, especially as relevant to the expansion of urban boundaries in those states covered by the section.

In language tracked by Section 5, Section 1 of the Fifteenth Amendment proclaims that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Since the post-Civil War enactment of the amendment, this language has been invoked to invalidate a host of devices and procedures designed by certain Southern states to deny the franchise to our nation's black citizens.[5] However, state legislatures desirous of abridging the voting rights of blacks proved themselves resilient and ingenious in erecting new obstructions to black voting. In 1957 Congress, employing the power vested in it by Section 2 of the Fifteenth Amendment "to enforce this [amendment] by appropriate legislation," authorized the Attorney General to seek injunctions against interference with the right to vote on racial grounds.[6] But the persistent state legislatures seemed able to avert even this power by delaying litigation and by turning to discriminatory devices not covered by the injunctions obtained.[7] Though Congress made further efforts in 1960 and 1964 to make accessible the electoral process to all Americans regardless of race, the impact on black voter registration was still not substantial.[8] In 1965 Congress acted again, this time with a "firm intention to rid the country of racial discrimination in voting" by "a complex scheme of stringent remedies." [9]

Section 5 of the 1965 Act, working in tandem with Section 4, is a central part of that scheme. Section 4 suspended use of any test or device [10] in determining eligibility to vote in states which were using a test or device in 1964 and where voter participation was below a minimum 50 per cent level in that year.[11] Section 5 protects the effectiveness of Section 4. To ensure that the covered states would not resort to the "stratagem of contriving new rules" [12] to evade efforts to secure blacks their rights to equal participation in the electoral process, this section effectively "freezes the election laws" [13] of states covered by Section 4. Before one of these states can administer any new "voting qualification or prerequisite to voting, or

---

4. *See* Allen v. State Board of Elections, *supra* note 3, 393 U.S. at 556.

5. *See* South Carolina v. Katzenbach, *supra* note 3, 383 U.S. at 311–312.

6. Pub.L. 85–315, § 131(b) & (c), 42 U.S.C. § 1971(a) & (c) (1970).

7. *See* South Carolina v. Katzenbach, *supra* note 3, 383 U.S. at 313–314.

8. *See* H.R.Rep.No.439, 89th Cong., 1st Sess., 9–11 (1965), U.S.Code Cong. & Admin.News, 1965, p. 2437.

9. South Carolina v. Katzenbach, *supra* note 3, 383 U.S. at 315.

10. The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.
42 U.S.C. § 1973b(c) (1970).

11. The suspension covered a minimum period of five years as the Act was originally enacted in 1965. Pub.L. 89–110, Title 1, § 4, 79 Stat. 438. However, a 1970 amendment extended the suspension period to 10 years. Pub.L. 91–285, § 3, 42 U.S.C. § 1973b(a). Section 4 was also amended to cover states or subdivisions of states which in 1968 employed a test or device and where voter participation was below 50% in that year. Pub.L. 91–285, § 4, 42 U.S.C. § 1973b(b).

12. South Carolina v. Katzenbach, *supra* note 3, 383 U.S. at 335.

13. Georgia v. United States, *supra* note 3, 411 U.S. at 538.

standard, practice, or procedure with respect to voting," it must obtain the approval of the Attorney General or a declaratory judgment from a three-judge District Court for the District of Columbia that the new practice or procedure (1) does not have the purpose and (2) will not have the effect of denying or abridging the right to vote on account of race or color.[14] As the Supreme Court has repeatedly made clear, Congress thus shifted the burden of proof in voting rights litigation on to the states,[15] requiring them to prove both the absence of a discriminatory purpose and the absence of a discriminatory effect before instituting new procedures which have any potential for abridging or denying voting rights of blacks.[16]

In Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Supreme Court determined that the "Voting Rights Act was aimed at the subtle, as well as the obvious," state schemes for denying voting rights and that Congress thus intended that the Act be given its "broadest possible scope."[17] In its next decision involving Section 5, Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), the Court held that a change in a city's boundary lines "which enlarge[s] the city's number of eligible voters also constitutes the change of a 'standard, practice, or procedure' with

respect to voting,' " and thus is covered by Section 5.[18] The *Perkins* Court reasoned that when a city expands its boundaries and adds new citizens to its voting rolls the votes of its old citizens are inevitably diluted. Quoting Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), it stressed that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."[19] *Perkins* left implicit the obvious: If the proportion of blacks in the new citizenry from the annexed area is appreciably less than the proportion of blacks living within the city's old boundaries, and particularly if there is a history of racial bloc voting in the city, the voting power of black citizens as a class is diluted and thus abridged.[20]

In August 1965 it was determined that Virginia was one of the states covered by Section 4 and thus by Section 5.[21] It is therefore our responsibility under Section 5 to deny approval to Richmond's annexation of new voters unless Richmond can carry the burden of proving that the annexation, as modified by the ward plan, (1) does not have the purpose of abridging black voting power and (2) will not have such an effect. "This is a heavy burden for a community in a state with Virginia's history of

---

14. *See* note 1 *supra.*

15. Georgia v. United States, *supra* note 3, 411 U.S. at 538: "It is well established that in a declaratory judgment action under § 5, the plaintiff State has the burden of proof." *See also* South Carolina v. Katzenbach, *supra* note 3, 383 U.S. at 335; City of Petersburg, Va. v. United States, D.D.C., 354 F.Supp. 1021, 1027–1028 (1972), *affirmed,* 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973).

16. The Supreme Court has characterized § 5 as "an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws." Allen v. State Board of Elections, *supra* note 3, 393 U.S. at 556. The Court did not hesitate, however, to uphold the section's

constitutionality. South Carolina v. Katzenbach, *supra* note 3, 383 U.S. at 334–335.

17. 393 U.S. at 565, 567.

18. 400 U.S. at 388.

19. *Id.* Perkins also emphasized that the *Allen* Court had decided that the dilution of black voting power which could follow upon a change from a single-member district to an at-large election of county officials required that such a change be subjected to § 5 scrutiny. *Id.* at 390. "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." Allen v. State Board of Elections, *supra* note 3, 393 U.S. at 569.

20. This meaning of *Perkins* was assumed in City of Petersburg, Va. v. United States, *supra* note 15, 354 F.Supp. at 1024–1025.

21. 30 Fed.Reg. 9897 (1965).

past racial discrimination." City of Petersburg, Va. v. United States, D.D.C., 354 F.Supp. 1021, 1027 (1972), *affirmed,* 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973).

## II

With Richmond's burden of proof in mind, we turn to an examination of the Master's report and the facts of this case. The parties stipulated to the record in Holt v. City of Richmond, E.D. Va., 334 F.Supp. 228 (1971), *reversed,* 4 Cir., 459 F.2d 1093, *cert. denied,* 408 U.S. 931, 92 S.Ct. 2570, 33 L.Ed.2d 343 (1972), a previous Fifteenth Amendment suit brought against the annexation,[22] and the Master based his findings on this record as well as on the three days of testimony before him. Most of the primary findings of fact from which the Master derived his ultimate finding that Richmond had failed to carry its burden of proving the annexation, as amended, was without discriminatory purpose and effect were not challenged by any of the parties.[23] We are thus able to set forth most of the history of the annexation for which Richmond seeks approval without direct reference to the record.

This history began in 1962 when the City filed an annexation suit against contiguous Chesterfield County seeking to obtain 51 square miles of territory.[24] This suit lay dormant for several years, during which time Richmond unsuccessfully attempted to annex land from another adjacent county.[25] It was settled in 1969 by compromise resulting in the annexation in suit of approximately 23 of the originally sought 51 square miles.[26] The period of the suit's dormancy witnessed a significant growth in black voting strength in Richmond. Blacks were rapidly becoming a majority of the population, and "[w]hile in 1968 there were more whites than Negroes registered to vote, about 50% of the registered Negroes voted as against approximately 30% of the white registered voters."[27] Racial bloc voting was evident and a black civic organization—intervenor Crusade for Voters—had gained substantial electoral power, rivaling its white counterpart—Richmond Forward. In the 1968 at-large City Council elections, Crusade-endorsed candidates won three of the nine Council seats from Richmond Forward endorsees.[28] The Master's findings indicate that these developments caused the Richmond white political leadership great concern that the black voting bloc would be able to elect a majority to the City Council in the 1970 elections. The Richmond mayor, white incumbent city councilmen, the city attorney, and other representatives of the City and its white political leadership expressed their sentiments to Chesterfield County officials, to a state commission studying Richmond's expansion, and to residents of the City. These expressions reflected a conviction that annexation of part of Chesterfield County was necessary to keep the black population from gaining control of the city in the 1970 elections.[29]

22. *See* note 43 *infra.*

23. Intervenors Curtis Holt, Sr. and Crusade for Voters were allowed to participate in this action as representatives of the black community.

24. Master's Findings of Facts, No. 2.

25. Holt v. City of Richmond, E.D.Va., 334 F.Supp. 228, 231 (1971).

26. Master's Findings of Facts, No. 3.

27. Holt v. City of Richmond, *supra* note 25, 334 F.Supp. at 232.

28. Defendants' Exhibit 8.

29. The Master set forth in his unchallenged Finding of Fact No. 6:

6. During the course of the annexation proceedings and thereafter, various City officials made statements on the annexation as follows:

(a) About 1966, at Farmville, Virginia, City Councilman James Wheat stated that the City of Richmond needed 44,000 leadership-type white affluent people.

\* \* \* \* \*

(b) Between July 16, 1968 and September 12, 1968, Alan F. Kiepper, Richmond City Manager, and Melvin W. Burnett, Executive Secretary of the Board of

Further unchallenged findings of the Master on the record before him strongly suggest that this conviction motivated Richmond's negotiation and acceptance of the 1969 annexation suit settlement agreement for which it now seeks Section 5 approval. The 1969 annexation negotiations with Chesterfield County were conducted for Richmond by its white mayor-city councilman, Phil J. Bagley. During the course of these negotiations, Mayor Bagley held meetings and conferences concerning their progress with the other five members of the Richmond City Council whose election had been endorsed by Richmond Forward, the predominantly white citizens group; the three members of the Council who had been endorsed by Crusade for Voters, the predominantly black citizens organization, were excluded from all of these meetings.[30]

Richmond's focus in the negotiations was upon the number of new white voters it could obtain by annexation; it expressed no interest in economic or geographic considerations such as tax revenues, vacant land, utilities, or schools.[31]

The mayor required assurances from Chesterfield County officials that at least 44,000 additional white citizens would be obtained by the City before he would agree upon settlement of the annexation suit.[32] And the mayor and one of the city councilmen conditioned final acceptance of the settlement agreement on the annexation going into effect in sufficient time to make citizens in the annexed area eligible to vote in the City Council elections of 1970.[33] The annexation suit settlement to which the six Richmond Forward-backed members of the City Council agreed obtained for Richmond 60 per cent of the total population and 59 per cent of the school-age children, but only 51 per cent of the value of tax assessable property and 46 per cent of the total land area, of the original portion of Chesterfield County for which annexation was sought.[34]

The annexation seemed to have the impact the Richmond officials who supported it desired. The 1970 census revealed that the black population within the old boundaries of Richmond was 52 per cent, but within the expanded bound-

---

Supervisors of Chesterfield County, met to negotiate the pending annexation suit. At those meetings, the only consideration stated by Mr. Kiepper was the number of white people and black people in the area to be annexed.

\*    \*    \*    \*    \*

(c) At a meeting in Williamsburg, Virginia, about March of 1969, City Attorney Conrad B. Mattox, Mayor Crowe, and Phil J. Bagley indicated to Irvin G. Horner, Chairman of the Board of Supervisors of Chesterfield County, that the City must annex a part of Chesterfield County or the City of Richmond would be taken over by the black population.

\*    \*    \*    \*    \*

(d) At a meeting of the Aldhiser Commission (created by the State Legislature to study the City's expansion) in July, 1968, Ed Willey and others representing the City of Richmond, said to Donald G. Pendleton, member of the House of Delegates, that the City was concerned about results of the 1970 City of Richmond Council races going all black.

\*    \*    \*    \*    \*

(e) In the fall of 1968, at a meeting with Leland Bassett at Charlottesville, Virginia, Mayor Bagley stated that "As long as I am the Mayor of the City of Richmond the niggers won't take over this town."

\*    \*    \*    \*    \*

(f) In February 1970, at the Willow Oaks Country Club, Henry Valentine of Richmond Forward, stated that the purpose of the annexation was to keep the City from going all black. City Councilman Nathan Forb was concerned about Richmond becoming another Washington, D. C.

\*    \*    \*    \*    \*

(g) On September 12, 1971, at a meeting of the Virginia Municipal League, Mayor Bagley stated to James G. Carpenter that niggers are not qualified to run the city.

30. Master's Findings of Facts, No. 5.

31. *Id.*, No. 4.

32. *Id.*

33. *Id.*, No. 9.

34. *Id.*, No. 7.

aries it was only 42 per cent.[35] The white citizenry was increased by the annexation by 45,705, while the black citizenry was increased by only 1,557.[36] The 1970 councilmanic elections were held on an at-large basis with the annexed Chesterfield County citizens participating. Candidates endorsed by the white citizens organization maintained their 6–3 majority on the City Council and only one black councilman was elected. None of the six elected councilmen who were endorsed by the white citizens organization received more than 8.4 per cent of the black vote.[37]

It is conceded here that Richmond conducted these elections illegally in violation of Section 5. It did not, prior to diluting by annexation the votes of the citizens residing within the old Richmond boundaries, obtain the approval of the Attorney General or a declaratory judgment from this court that this dilution did not have the purpose and would not have the effect of abridging the right to vote on account of race or color.[38] Richmond has held no councilmanic elections since 1970[39]; the illegally elected City Council continues to serve to this time. It was only after the decision in Perkins v. Matthews, *supra*, and after the Attorney General had informed Richmond that it was in violation of the Voting Rights Act, that the City made its belated attempts to conform to the commands of Section 5. On March 8, 1971 Richmond submitted the annexation and the concomitant changes in its election practices to the Attorney General. On May 7, 1971 the Attorney General interposed an objection to the election practice changes resulting from

the annexation. On December 9, 1971 Curtis Holt, Sr., a black citizen living within the old Richmond boundaries and an intervenor in the case at bar, filed an action in the District Court for the Eastern District of Virginia seeking a judgment that the annexation was without effect for lack of prior approval by the Attorney General or this court.[40] On August 25, 1972, five days prior to a scheduled hearing in this Virginia District Court case,[41] more than a year after the Attorney General objected to the annexation under Section 5, and almost two years after it had conducted its 1970 councilmanic elections in violation of Section 5, the City finally filed the instant suit in this court.

■ As originally filed, this suit asked us to declare nondiscriminatory in purpose and effect the annexation and concomitant changes in election practices as instituted in 1970. It could hardly be clearer that on the Master's unchallenged and fully supported factual findings we could not have issued such a declaration. The City apparently was moved in 1962 to file its annexation suit against Chesterfield County by legitimate goals of urban expansion.[42] However, Richmond, which we again emphasize must carry under Section 5 the heavy burden of proving the absence of a discriminatory purpose as well as the absence of a discriminatory effect, offered no evidence to explain why the suit was settled in 1969 by negotiations focusing on the number of white citizens the City would obtain and after the City's controlling white officials had stated that the annexation was necessary in 1969 to avert a black political take-

35. *Id.*, Nos. 10 & 11.

36. *Id.*, No. 11.

37. Defendants' Exhibit 9.

38. *See* text at notes 12–21 *supra*.

39. The 1972 City Council elections were enjoined by the Supreme Court under § 5. Holt v. City of Richmond, 406 U.S. 903, 92 S.Ct. 1602, 31 L.Ed.2d 814 (1972). Richmond is presently enjoined from holding any elections under an order of a three-judge District Court in Virginia.

40. Holt's standing to bring such an action had been affirmed by the Supreme Court in Allen v. State Board of Elections, *supra* note 3, 393 U.S. at 554–557.

41. Holt's § 5 case was brought independently of his earlier direct 15th Amendment challenge to the annexation. *See* text at note 22 *supra* and note 43 *infra*.

42. *See* Holt v. City of Richmond, *supra* note 25, 334 F.Supp. at 231.

over of the City.[43] In addition, given the Master's unchallenged finding that there was uncontroverted evidence of racial bloc voting in Richmond and the fact that almost all of the annexed citizens were white, we cannot say that the expansion of Richmond's boundaries and the concomitant changes in its election practices instituted in the 1970 councilmanic elections did not have the effect, as well as the purpose, of diluting the black vote.

■ We conclude, then, that Richmond's 1970 changes in its election practices following upon the annexation were discriminatory in purpose and effect and thus violative of Section 5's substantive standards as well as the section's procedural command that prior approval be obtained from the Attorney General or this court. The primary thrust of Richmond's present arguments before this court, however, is that any discriminatory purpose and effect of the annexation was purged by the City's adoption, on April 25, 1973, of a single-member district, nine-ward plan for future councilmanic elections. Richmond amended its complaint in this action and now asks us to declare that the changes in its election practices resulting from the annexation as modified by the ward plan do not have a discriminatory purpose or effect. The City thus directs its attack on the finding in the Master's report that the ward plan does not remove the discriminatory taint from the annexation.

Richmond undertook to develop a ward plan after the decision in City of Petersburg, Va. v. United States, *supra*, and it now relies on *Petersburg* to argue that the annexation was made lawful by the adoption of its single-member district plan. The *Petersburg* court was asked to approve under Section 5 an annexation which eliminated a black population majority in Petersburg. In light of evidence of a history of voting along racial lines in Petersburg, the court held that the City could not prove that its submitted annexation plan would not have the effect of diluting black votes. However, emphasizing the legitimate financial and geographic interests of Petersburg in the annexation *and the absence of any evidence that the annexation was accomplished for the purpose of diluting black voting power*,[44] the court suggested that if the City changed from an at-large system for electing its city council to a ward system "calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters," [45] the annexation could pass Section 5 scrutiny.

43. We are not, contrary to the City's arguments, precluded from finding that Richmond failed to prove the absence of a discriminatory purpose in negotiating the 1969 annexation by the decision of the 4th Circuit in Holt v. City of Richmond, 459 F.2d 1093, *cert. denied*, 408 U.S. 931, 92 S.Ct. 2510, 33 L.Ed.2d 343 (1972), *reversing* E.D.Va., 334 F.Supp. 228 (1971). The *Holt* court reversed a District Court decision that the 1969 annexation compromise violated the 15th Amendment because of a discriminatory motivation. However, the 4th Circuit predicated its reversal on a line of Supreme Court cases holding that actions of legislatures are to be voided for unconstitutional motivation only in the rarest instances after the most convincing showing that the legislators could not have had legitimate goals. 459 F.2d at 1097–1100. *Compare* Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), *with* Palmer v. Thompson, 403 U.S. 217, 224–225, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); United States v. O'Brien, 391 U.S. 367, 382–386, 88 S.Ct.

1673, 20 L.Ed.2d 672 (1968); Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130, 3 L.Ed. 162 (1810). The *Holt* court found that plaintiff Holt in that case had not carried such a heavy burden of proof. This case is not brought directly under the 15th Amendment and is not controlled by the constitutional cases cited by the *Holt* court. As stated above, the Supreme Court has made clear that in a § 5 declaratory judgment suit the state must carry the burden of proof that it did not have a discriminatory purpose. Indeed the 4th Circuit, like the District Court it reversed, fully understood that its decision had no effect whatever on the determination we must make under § 5. 459 F.2d at 1100; 334 F.Supp. at 242.

44. The court specifically found that the City "expanded into those areas which were the most reasonably available and which were the most desirable for accomplishing the legitimate purposes of annexation." City of Petersburg, Va. v. United States, *supra* note 15, 354 F.Supp. at 1024.

45. *Id.* at 1031.

The Master concluded that Richmond did not, under *Petersburg*, purge its annexation of illegality by its adoption of a ward plan. We agree for two reasons. First, initially we find this case distinguishable from *Petersburg* in one significant respect: Richmond, unlike Petersburg, has not proved that it did not expand its boundaries for the *purpose* of abridging the voting rights of its black citizens. Second, we cannot, in any case, find that the *Petersburg* standard as to effect has been met by Richmond. We are not convinced that the ward plan adopted by Richmond was "calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters."

We will address first the importance of Richmond's failure to prove, as Petersburg did, that its annexation did not have a discriminatory purpose. We do not agree with the Master's conclusion that a city which has originally annexed territory for the purpose of maintaining a white voting majority could never prove that it no longer had such a discriminatory purpose in retaining the annexed area after adoption of a single-member district ward plan. However, we also do not agree with Richmond that a city's mere showing that it has made some effort to remove the discriminatory effect of an annexation by adoption of a ward plan is sufficient to prove that it does not retain the annexed voters for a discriminatory purpose. We realize that cities with histories of racial discrimination and bloc voting in states covered by Sections 4 and 5, even cities in which the number of black citizens is approaching a majority, may have legitimate economic reasons for desiring to expand their boundaries into surrounding areas which coincidentally contain many more white than black citizens. We think that when such a city demonstrates that its boundary expansion is not motivated by a desire to dilute black voting power, a ward plan calculated to minimize any dilution that could occur should, as stated in *Petersburg*, save the annexation from illegality under Section 5. However, when such a city violates the Voting Rights Act by proceeding, without approval of the Attorney General or this court, with annexation of a large number of white citizens for the purpose of diluting the vote of its black citizens, an extra burden rests on that city to purge itself of discriminatory taint as well as to show that the annexation will not have the prohibited effect. To convince a court that such a city, by adoption of a ward plan, has purged itself of a discriminatory purpose in an annexation of new voters, it would have to be demonstrated by substantial evidence (1) that the ward plan not only reduced, but also effectively eliminated, the dilution of black voting power caused by the annexation,[46] and (2) that the city has some objectively verifiable, legitimate purpose for annexation.

In this case Richmond has failed to present substantial evidence that its original discriminatory purpose did not survive adoption of the ward plan. The Master concluded that the "City has failed to establish any counterbalancing economic or administrative benefits of the annexation."[47] The Master's conclusion was predicated upon findings of fact supported by direct testimony before him. The Master further found that the return of the annexed area to Chesterfield County would actually save the City at least $8.5 million of operating loss per year and $21.3 million of required capital outlay. The Master also found that only 6.25 per cent of the vacant land received by Richmond in the settlement annexation was capable of development.[48] He further concluded from the testimony of a Chesterfield

---

46. The *Petersburg* court was fully aware that the "calculated to neutralize to the extent possible" standard which it established for annexations not motivated by a discriminatory purpose requires a city to minimize but not necessarily to remove entirely any dilution of black voting power caused by the annexation. *Id.* at 1031.

47. Master's Conclusions of Law, No. 17.

48. Master's Findings of Facts, No. 26.

County official that the County is not only financially and administratively able and willing to reassume control over the annexed area and to reimburse the City for its previous expenditures in the area, but could do so without any significant inconvenience to or detrimental effect on the annexed citizens.[49] Richmond did not offer any testimony before the Master to controvert these findings. It objects, however, to the Master's conclusion that there are no economic or administrative reasons to retain the annexed area on the basis of the record and decision in Holt v. City of Richmond, *supra*. The City cites from this record an estimate that revenues from the annexed area for fiscal year 1971–72 exceeded appropriations from it by about $1.5 million. Richmond further quotes a portion of the *Holt* decision containing the opinion of the Richmond City Manager that de-annexation would be a job to "boggle the mind" and the opinion of the *Holt* court that Richmond would be in a weak bargaining position in any de-annexation negotiations.[50] These evidentiary references to *Holt* were, of course, considered by the Master in making his findings.[51] They do not persuade us that the Master's findings are wrong, nor do they dissipate the evidence of illegal purpose which permeates this record.[52]

Moreover, because the City has failed to demonstrate that its ward plan effectively removes the dilution of black voting power caused by the annexation, even if we were convinced that Richmond now has legitimate reasons for annexation and for resisting de-annexation, we would still not be convinced that the City's discriminatory purpose does not linger. The City maintains that its ward plan actually enhances black voting power in Richmond. The single-member districting plan adopted by the City includes four wards with heavy white population majorities, four wards with heavy black population majorities, and one ward which is 40.9 per cent black.[53] Richmond contends that this plan assures the black citizenry of four seats on the Council and at least gives them some hope of capturing a fifth seat. Richmond argues that this is more political power than blacks could have in an at-large system within Richmond's old boundaries because, while blacks have a population majority within these boundaries, they still comprise only 44.8 per cent of the voting-age population. Although Richmond's argument has considerable force on its surface, we are not convinced by it that Richmond's ward system sufficiently compensates for the dilution of black voting power caused by the annexation.

49. *Id.*, Nos. 23–25.

50. 324 F.Supp. at 238–239. Intervenor Crusade for Voters argues that the addition of white children from the annexation would aid school desegregation efforts in Richmond. We take note of Bradley v. School Board of City of Richmond, Va., 4 Cir., 462 F.2d 1058 (1972), *affirmed by equally divided Court*, 412 U.S. 92, 93 S.Ct. 1952, 36 L. Ed.2d 771 (1973), which held that the 14th Amendment did not require Richmond to merge its school system with those of surrounding Henrico and Chesterfield Counties in order to effect full integration of these school systems. However, the history of Richmond's resistance to the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *see* Bradley v. School Board of City of Richmond, Va., *supra*, at 1074–1076 (Winter, J., dissenting), causes us to doubt that Richmond's white leadership has at any time been motivated by the cause of school desegregation to maintain the expansion of Richmond's boundaries.

51. Richmond also refers the court to a study by the Urban Institute showing a 1971 fiscal year surplus from the annexed area. This study was not made part of the record before the Master, however, *see* Transcript of Master's Hearing (hereinafter Tr.) 606–607, and it could not in any case remove the doubts created by testimony at the hearing.

52. We emphasize again that we do not doubt that Richmond's leadership was motivated in 1962 by nondiscriminatory goals in filing its 1962 annexation suit. We simply question that the City has established benign purposes for retaining the particular 1969 compromise annexation negotiated for the purpose of diluting black voting power.

53. Attachment to plaintiff's Exhibit 18; Tr. at 615.

First, we think it our responsibility under Section 5 to thwart attempts of covered states to dilute the potential future voting power of black citizens as well as their present voting strength. The fact that the percentage of Richmond blacks of voting age is appreciably less than the percentage of blacks in the total population of course means that there are proportionately more black youngsters. We, like the white political leadership of Richmond, can anticipate that the present black population majority witin Richmond's old boundaries will translate in a few years into a voting-age majority.[54] In an at-large system such a majority would ensure that none of the nine City Council seats was occupied by a candidate who appealed only to a white voting bloc, ignoring the needs and aspirations of Richmond's black citizens. The unchallenged findings of the Master indicate that the Richmond white political leadership in the late 1960's feared that absent annexation the black population would gain an electoral majority some time in the 1970's. We cannot say, in light of population growth trends in Richmond, that the Richmond City Council was not still motivated by that fear in adopting a ward plan to avoid de-annexation.[55]

Second, it is not clear to us that Richmond's black citizenry would not have greater actual political power in an at-large, de-annexed system than in a single-member ward, annexed system even before their overall population majority resulted in a voting-age majority.[56] The Master's findings on the concerns of the City's white leadership, as well as testimony of the black Richmond leadership before the Master,[57] suggest that political power in Richmond turns on controlling five majority seats on the City Council[58]; three or even four seats provide forums from which to voice dissents, but not to wield effective power. There is good reason to think that blacks would have a greater opportunity to elect five councilmen responsive to their concerns and interests in an at-large system within Richmond's old

54. The population figures on which Richmond relies are taken from the 1970 census results. Translation of the population majority into a voting-age majority may have already occurred.

55. Richmond has not suggested to us that we focus on the percentage of registered voters who are black. To do so would of course be circular; a primary reason why black registration has been low relative to that of whites is the black citizen's awareness that his vote has traditionally had less impact. Cf. Zimmer v. McKeithen, 5 Cir., 485 F.2d 1297, 1306 (1973) (en banc); Beer v. United States, D.D.C., 374 F.Supp. 363, 396–397 (1974). The Voting Rights Act was enacted to render a future transformation in the reality on which that black awareness was based. In stressing the total black population percentage, we look toward that future transformation.

56. We must look beyond percentages, whether they be of total populations or of voting-age populations, to determine the effect of the boundary expansion on the voting power of blacks and their access to the political process. As the 5th Circuit has recently stated:

* * * Inherent in the concept of fair representation are two propositions: first, that in apportionment schemes, one man's vote should equal another man's vote as nearly as practicable; and second, that assuming substantial equality, the scheme must not operate to minimize or cancel out the voting strength of racial elements of the voting population. Both the Supreme Court and this court have long differentiated between these two propositions. And although population is the proper measure of equality in apportionment, in Whitcomb v. Chavis, 403 U.S. 124, 149–150, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and White v. Regester, supra, 412 U.S. at 765, 93 S.Ct. at 2339, 37 L. Ed.2d at 324, the Supreme Court announced that access to the political process and not population was the barometer of dilution of minority voting strength.
Zimmer v. McKeithen, supra note 55, 585 F. 2d at 1303 (footnotes omitted). In Georgia v. United States, supra note 3, 411 U.S. at 531, the Supreme Court admonished that § 5 is concerned "with the reality of changed practices as they affect Negro voters."

57. Tr. at 617–618.

58. The mayor has been elected from and by the City Council.

boundaries than in a ward system operating within the expanded boundaries.

■ We note that, because past recent voting has only been roughly along racial lines, three councilmen who have predominantly appealed to black voters were elected in 1970 in the face of a black voting-age minority of 37.3 per cent.[59] If the black voting-age minority was increased by de-annexation to 44.8 per cent, two or more additional candidates who appealed to black voters might well be elected. The potential for this happening may be greater than the potential for election of a fifth black voting bloc-supported councilman from what the City has characterized as the "swing ward" in their ward system. For though the City stresses a 40.9 per cent overall black population percentage in this ward, the black voting-age population is only 38.5 per cent.[60] Since substantial doubt exists that the dilution of the black vote caused by the annexation was eliminated by adoption of the ward

plan,[61] it appears that the white political leadership presently in control of Richmond adopted the ward system for the purpose of doing what they could to maintain the dilution of the black vote produced by annexation. Richmond did not carry the heavy burden we think must be imposed on a city which argues that adoption of a single-member district ward plan purges its discriminatory purpose in annexing white citizens.[62]

In addition to a discriminatory purpose, the annexation also had a discriminatory effect under the *Petersburg* standard since the ward plan was not "calculated to neutralize to the extent possible any adverse effect upon the participation of black voters." The Master did not find, and indeed on the basis of the evidence before him could not find, that Richmond fashioned its ward plan "to neutralize to the extent possible" the dilution of black voting power caused by the annexation.[63] As found by the Mas-

---

59. Tr. at 219.

60. Tr. at 616.

61. Because of our understanding of the political importance of obtaining a majority on the City Council, we have not included in our analysis the effect of the annexation on the black voting bloc's influence on the election of the City's five "constitutional" officers: Commonwealth's attorney, city treasurer, commissioner of revenue, sheriff, and clerk of court. These officers, whose positions are provided for in the Virginia Constitution, see Art. VII, § 4 (1973); see also Va.Code § 15.1–40.1 (1973), are of necessity elected on an at-large basis. Thus with respect to these officers the ward system does nothing to counteract the dilution of the black vote caused by the annexation. See generally City of Petersburg, Va. v. United States, supra note 15, 354 F.Supp. at 1029–1030.

62. The above discussion of our doubts that Richmond's ward plan eliminated the dilution of black voting power caused by the annexation renders academic Richmond's claim that when a state or subdivision demonstrates that a change in a practice or procedure has no discriminatory effect the absence of a discriminatory purpose should be presumed under § 5. We pause, however, to register our firm disagreement with Richmond's position. Section 5 requires the state to carry

the burden of proof on two interrelated but independent issues: (1) whether there will be a discriminatory effect, and (2) whether there was a discriminatory purpose. See, e. g., City of Petersburg, Va. v. United States, supra note 15, 354 F.Supp. at 1027. Carrying the burden on the first issue cannot reverse the burden on the second.

63. Richmond seems to interpret *Petersburg* to mean that, where a city elects its city council under a ward system, any expansion of its boundaries can defeat a § 5 challenge. This interpretation not only is contradicted by the plain language of *Petersburg*, requiring the city to "neutralize *to the extent possible* any adverse effect upon the political participation of black voters," 354 F.Supp. at 1031 (emphasis added), but also collapses under simple analysis. For if Richmond's position were adopted, the incumbent white political leadership of a city which already elected its councilmen under a single-member district ward system could, without running afoul of § 5, selectively annex as many additional white wards as it anticipated it needed to maintain the city's white political predominance. Surely Congress did not intend § 5's "severe * * * procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws," Allen v. State Board of Elections, supra note 3, 393 U.S. at 556, to be so easily circumvented.

ter on the basis of undisputed testimony before him, Richmond's ward plan was drawn by Dallas H. Oslin, senior planner for the City, without reference to the racial living patterns in Richmond. Oslin, a lone-wolf worker, testified before the Master that the only direction he received from the City was to keep the wards within a four to five per cent variance from population equality[64] and that he did not even know, beyond rough impressions, the locations of Richmond's black population.[65] Oslin framed the ward plan on the basis of factors such as "compactness," "physical boundaries," and "likeness of area." [66] While Richmond could have legitimately taken these factors into account, they should have been accommodated to the goal of minimizing dilution of the black vote.[67]

Our conclusion that the City's ward plan does not "to the extent possible" minimize dilution of the black vote is further buttressed by an alternative ward plan developed and submitted to the court by intervenor Crusade for Voters. The Crusade plan provides for four heavily white wards, four heavily black wards, and a "swing ward" with a 59 per cent black population.[68] Since this "swing ward," much more than the 40.9 per cent black "swing ward" in the City's plan, provides a candidate supported by blacks an opportunity to be elected to the critical fifth seat on the City Council, Crusade's plan suggests

that the City could have done more to compensate for the dilution of black voting power caused by the annexation. Thus even if Richmond had placed this case in the posture of *Petersburg* by proving the absence of any discriminatory purpose, it would still be an abuse of the heavy responsibility placed upon us by Section 5 to grant the declaratory judgment the City seeks.

### III

Our denial of Richmond's request for a declaratory judgment does not end this case for intervenor Holt, nor did it end the case for the Master. Holt requests and the Master recommends that this court enjoin Richmond to de-annex the land obtained from Chesterfield County in order that a new councilmanic election can be immediately held within the old boundaries of Richmond.[69]

There are indeed strong equities in favor of such an injunction. Since those individuals who were annexed by Richmond must be permitted to be full voting citizens of the community in which they reside, a Richmond election which denied these individuals the vote would require a de-annexation.[70] Yet the citizens of Richmond living within the old boundaries can voice a strong claim for the immediate conduct of an election within the old boundaries to remove the present City Council. These citizens have not had an opportunity since 1968

64. Tr. at 293–294.

65. Tr. at 306–308.

66. Master's Findings of Facts, No. 19.

67. Without reference to racial living patterns, Oslin drew four ward plans which were submitted to the Attorney General during the pendency of this suit. The Attorney General notified Richmond that if it made some minor modifications in one of these ward plans it would meet the *Petersburg* standard. It is this ward plan as modified in accordance with the Attorney General's suggestion which the City adopted and submits to us.

68. Attachment to Exhibit 21 of defendant-intervenor Crusade for Voters. Crusade asks that we approve the City's annexation as modified by Crusade's ward plan. Our spe-

cial function under § 5, however, is to approve practices and procedures with respect to voting submitted by covered states or their subdivisions. Richmond has not adopted or submitted Crusade's plan. Though the effect of a plan may be anticipated in advance of its adoption, *cf.* City of Petersburg, Va. v. United States, *supra* note 15, we cannot give full consideration to whether a city has a discriminatory purpose in adopting a plan before it actually does so.

69. The Master properly titled his recommendation of a de-annexation order a conclusion of law. As such, we need not give it the deference of the "clearly erroneous" standard appropriate under Rule 53(e) for findings of fact. *See* note 2 *supra*.

70. *See* Holt v. City of Richmond, *supra* note 25, 334 F.Supp. at 239.

to cast a ballot in an election which was not violative of the 1965 Voting Rights Act. The present City Council was elected in the 1970 elections and serves today several years after Richmond was notified that these elections were held in violation of Section 5. The 1970 elections were illegal because they were conducted pursuant to a change in a practice or procedure of voting without approval being obtained from this court or the Attorney General. Our denial of Richmond's request for *ex post facto* approval of its 1970 change in election practices underscores the illegality of these elections. The Supreme Court has stated that Section 5

> essentially freezes the election laws of the covered States unless a declaratory judgment is obtained in the District Court for the District of Columbia holding that a proposed change is without discriminatory purpose or effect. * * *

Georgia v. United States, 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973).[71] For four years now Richmond has avoided this intended "freezing" effect; intervenor Holt asks only that we return Richmond to the position it would be in today had it followed the procedures of Section 5 in accordance with congressional intent.[72]

■ The City of Richmond and the Attorney General argue that, whatever the equities, this court does not have jurisdiction to order de-annexation. We disagree. Richmond and the Attorney General base their argument on the first opinion in Beer v. United States, D.D.C., 374 F.Supp. 357 (1974) (hereinafter *Beer I*). The *Beer I* court was asked by the City of New Orleans, Louisiana to declare nondiscriminatory in purpose and effect a plan of redistricting for councilmanic elections. New Orleans had not held elections under the new plan for which it sought approval. Several nonincumbent candidates for the City Council in New Orleans petitioned the *Beer I* court, during its consideration of New Orleans' request, to establish a schedule for councilmanic elections. The court refused to consider the merits of the candidates' petition, stating that it was without power to grant the relief requested.

We think the *Beer I* case distinguishable on its facts. We are asked merely to employ our equitable power to enforce the mandate of Section 5 that election procedures be frozen in covered states until a declaratory judgment of approval has been obtained from this court. We are asked to declare void and remove the effects of those procedures and practices which were not to be implemented without the approval of this court—an approval which we herein deny. The *Beer I* court, which was not presented as are we with the *fait accompli* of a past election held under illegal practices and procedures, itself enjoined future elections under New Orleans' unapproved redistricting plan.[73] The *Beer I* court only balked when it was asked to schedule local councilmanic elections and thus to probe issues "tangential"[74] to the command of Section 5 that election practices

---

71. *See also* Joint Views of 10 Members of the [Senate] Judiciary Committee Relating to Extension of the Voting Rights Act of 1965, 116 Cong.Rec. (Part 4) 5517, 5519 (March 2, 1970), *quoted* in City of Petersburg, Va. v. United States, *supra* note 15, 354 F.Supp. at 1028.

72. Words from Perkins v. Matthews, *supra* note 3, also reverberate loudly against Richmond's evasion of § 5's intent:

 * * * [B]ased upon ample proof of repeated evasion of court decrees and of extended litigation designed to delay the implementation of federal constitutional rights, Congress expressly indicated its in-

tention [in enacting § 5] that the States and subdivisions, rather than citizens seeking to exercise their rights, bear the burden of delays in litigation.

400 U.S. at 396 (footnote omitted).

73. The *Petersburg* court, also not confronted by the effects of an already conducted illegal election, issued a similar injunction, restraining Petersburg from holding any elections within its expanded boundaries before § 5 approval for the annexation was obtained. *See* 354 F.Supp. at 1023–1024.

74. Beer v. United States, D.D.C., 374 F. Supp. 357, 361 (1974).

and procedures not be changed without prior approval.

We do not assent to any language in the *Beer I* opinion which does suggest that this court has jurisdiction only to grant or deny a declaratory judgment sought by a covered state or its subdivision. Such a limitation on our power would remove from us "the broad equitable jurisdiction that inheres in courts" to give effect to the policy of the legislature which they oversee, Porter v. Warner Holding Co., 328 U.S. 395, 403, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). The Supreme Court again made clear this year that a court is presumed to be able to wield "the inherent powers of an equity court" in implementing a congressional policy with which it is entrusted. Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123, 42 U.S.L.Week. 4203, 4209 (February 19, 1974).

> \* \* \* Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. "The great principles of equity, securing complete justice, should not be yielded to light

inferences, or doubtful construction." Brown v. Swann, [35 U.S. 497] 10 Pet. 497, 503 [9 L.Ed. 508]. \* \* \*

Porter v. Warner Holding Co., *supra*, 328 U.S. at 398.[75] We perceive no clear indication in the Voting Rights Act or its legislative history that Congress, when entrusting this court with responsibility under Section 5, meant to limit our power to enforce the section's direct command that voting practices and procedures not be changed without prior approval.[76] The *Beer I* court stressed that Allen v. State Board of Elections, *supra*, made clear that, while a local three-judge District Court can determine whether a given administrative change is covered by Section 5 and can enjoin its implementation prior to approval if it is covered, only a three-judge District Court in the District of Columbia can declare that a covered change does not have a discriminatory purpose or effect. But we do not think it evident that Section 5's limitation on the power of local three-judge District Courts by placing declaratory judgment authority exclusively in our hands limits our equitable jurisdiction by making this declaratory authority exclusive of all other power.[77]

---

**75.** *See also* Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 290–291, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) ; Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 16–17, 62 S. Ct. 875, 86 L.Ed. 1229 (1942). It is interesting to note that the declaratory judgment statute itself provides for equitable relief, at least when a declaratory judgment is granted.

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202(1970).

**76.** The fact that the Voting Rights Act does not explicitly empower this court to issue on the motion of private parties injunctions voiding past implementation of practices and procedures which have failed to obtain approval under § 5 does not constitute such an indication. Congress did not explicitly authorize any court to enter such injunctions on the motion of private parties, yet the Su-

preme Court has at least made clear that local three-judge District Courts have authority to consider requests of private parties to invalidate illegal elections and order the conduct of new ones. *See* Allen v. State Board of Elections, *supra* note 3, 393 U.S. at 554–557.

**77.** The "strong" reason which the *Allen* Court offered for its interpretation of § 5's limitation on the power of local three-judge District Courts does not support a reciprocal limitation on the power of this court. The *Allen* Court noted that, whereas suits to require submission of an electoral change for approval will often be brought by aggrieved private citizens who might be greatly burdened by having to come to the District of Columbia to bring suit, the states who must bring declaratory judgment actions can afford the costs of litigating here. 393 U.S. at 559. If the private citizen has already intervened in a state-initiated declaratory judgment action before this court, it would be ridiculous for us to refuse to grant an injunction because it would have been less of a

■ Though we believe we do have jurisdiction to enforce the direct command of Section 5 by enjoining the annexation in order that councilmanic elections within Richmond's old boundaries can be immediately held, we nonetheless refrain from doing so. Our restraint derives from the same considerations which we suspect ultimately underlay the *Beer I* court's decision: hesitancy "to become involved in the intricacies of local political redistricting * * * or * * * to take over the traditional responsibility of a local court to resolve questions more conveniently litigable before its bench." *Beer I, supra*, 374 F. Supp. at 362.

We are particularly influenced by the Supreme Court's handling of the remedial issue in Perkins v. Matthews, *supra*. Though the *Perkins* Court held that Canton, Mississippi had violated Section 5 by allowing annexed citizens to vote in its 1969 elections without obtaining prior approval from this court or the Attorney General, the Court refused to set aside the 1969 elections and order immediate new elections within Canton's old boundaries. The Court instead remanded the case to the local three-judge District Court, emphasizing that since the local court was "more familiar with the nuances of the local situation than are we," "the question of the appropriate remedy is for that court to determine, in the first instance * * *."[78] *Perkins* involved review of a local District Court's failure to require Canton to submit its changed procedures for approval, and the Supreme Court suggested that the case for ordering new elections under old procedures would be stronger if, as in our case, approval was sought and not

obtained.[79] However, we think the local District Court's familiarity "with the nuances of the local situation" is as relevant here as in *Perkins*; we are no more aware of these nuances in our case than was the Supreme Court in *Perkins*. The local District Court can better balance all relevant factors, including our refusal to grant Richmond a declaratory judgment, in deciding whether to order de-annexation.

As noted above, intervenor Holt has already filed in the District Court for the Eastern District of Virginia an action seeking a judgment that the annexation was without effect for lack of prior approval by the Attorney General or this court. Proceedings in that action have been stayed pending decision in this case. We perceive no reason why Holt cannot repair to the District Court in Virginia and obtain not only fair, but also more fully informed, consideration of his request for de-annexation.

It should be totally clear by this point, however, that our refusal to order de-annexation and immediate new elections does not mean that Richmond is free to hold more elections within its expanded boundaries. Because of our denial of the declaratory judgment it sought, Richmond continues to be restrained by Section 5 from holding elections in which individuals residing within the annexed area are permitted to participate.

The application for declaratory judgment is denied.

WILLIAM B. JONES, District Judge:

I concur in the result as well as in Parts I and II of Judge Wright's opinion. I dissent from Part III of that

burden on him to have requested it in a local District Court.

**78.** 400 U.S. at 397. In both Allen v. State Board of Elections, *supra* note 3, and Georgia v. United States, *supra* note 3, states had also held elections under new practices and procedures with respect to voting without obtaining the requisite prior approval. The Supreme Court refrained from ordering immediate new elections under the old practices and procedures in each case. However,

the Court's stated reason for refraining is in neither case relevant here. In *Allen* the Court stressed that the "§ 5 coverage questions involve[d] complex issues of first impression." 393 U.S. at 572. And in *Georgia* the Court noted that the elections had been conducted under the disputed new procedures by reason of its own stay order. 411 U.S. at 541.

**79.** 400 U.S. at 396–397.

opinion which states that this Court has jurisdiction "to enforce the direct command of Section 5 by enjoining the annexation in order that councilmanic elections within Richmond's old boundaries can be immediately held * * *."